IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>      Respondent,<br><br>   v.<br><br>META PLATFORMS, INC., formerly doing business as FACEBOOK, INC.,<br><br>      Appellant. | No. 84661-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

DÍAZ, J. — "[A] well-informed electorate is as vital to the survival of a democracy as air is to the survival of human life." Gaspee Project v. Mederos, 13 F.4th 79, 95 (1st Cir. 2021). In this case, that foundational principle runs up against a social media conglomerate's First Amendment rights, as well as other federal and state statutory concerns.

The State sued Meta Platforms, Inc. (Meta) for violating relatively new provisions of Washington's Fair Campaign Practices Act and its implementing legislation, namely, RCW 42.17A.345 and WAC 390-18-050 (together, the disclosure law). The disclosure law requires Meta to maintain certain records of the political advertisements it hosts on its platforms and, when requested, to permit inspection of, or to disclose, such records to those seeking such information.

The superior court granted the State's motion for summary judgment on both liability and damages, denied Meta's cross-motion, and entered a $35 million judgment against Meta, two-thirds of which consisted of a civil penalty and one-third of which was an award of the State's attorney fees and costs.

Meta appeals and argues that the disclosure law violates the First Amendment to the United States Constitution and is preempted by the federal Communications Decency Act, 47 U.S.C. § 230 (Section 230). Alternatively, Meta argues the superior court miscalculated the damages it imposed. For the reasons below, we affirm the superior court in whole.

## I.  BACKGROUND

### A.  Overview of the Factual Background

The parties do not dispute the following factual background. Meta is the parent company of Facebook, Inc., and other international online social media networking platforms, serving over 2 billion monthly users. In pertinent part, Meta allows people and organizations to purchase advertisements directed to Meta's general membership or selected parts of their membership. These advertisements have included political topics, such as promoting candidates for local and state elections. As will be discussed in more detail below, Meta allows advertisers to target their ads to specific users or groups of users, encompassing a wide range of demographic traits, through a self-service tool. These demographic traits include Meta users' age, race, ethnicity, gender, location, interests, and more.

In approximately May 2018, Meta created an "Ad Library." The Ad Library includes advertisements Meta identifies as "political," which it commits to retain for

seven years. Meta also retains information necessary to identify each advertiser. Meta further captures each advertiser's intended audience and its demographics, amounts spent, number of "impressions" generated by the advertisements, and more. The Ad Library is publicly viewable online.[1] It is undisputed that Meta's Ad Library contains much but not all of the information required by the disclosure law.

In June 2018, the State sued Meta for the first time for failing to comply with the disclosure law. In its complaint, the State alleged that at least two members of the public requested information from Meta about political ads hosted on its platforms, and Meta did not provide the information the disclosure law required.[2] In December 2018, Meta entered into a stipulated judgment, where it agreed to pay $200,000 in damages.

On December 28, 2018, Meta announced that it would no longer accept ads related to Washington electoral campaigns. Despite the ban, however, ads related to political campaigns in Washington still appeared on Meta's platforms and in its Ad Library. For example, through Meta's self-service portal, advertisers placed approximately 1,600 ads related to Washington's 2019 elections on Meta's platforms.

In 2019, two requesters observed political ads on Meta's platforms and contacted Meta by email, requesting information about the ads pursuant to the disclosure law. Both requestors filed complaints with the Public Disclosure

---

[1] META AD LIBRARY, http://www.facebook.com/ads/library (last accessed May 24, 2024).
[2] The complaint alleged violations that occurred before the 2018 creation of the Ad Library.

Commission (PDC) after receiving incomplete information from Meta. After investigating, the PDC referred the matter to the Washington Attorney General's Office (AGO).

Later and separately, a third requestor also viewed political ads on Meta's platforms, but did not see the same ads in Meta's Ad Library. Between 2019 and 2021, this requestor unsuccessfully attempted to request information about various ads from Meta. Unlike the previous requestors, this person also visited Meta's facilities in-person, requesting to review their records. Unsatisfied, the requestor filed a complaint with the AGO, who forwarded it to the PDC, which returned the matter to the State to litigate.

B.     Superior Court History

In April 2020, the State filed a complaint in the King County Superior Court. The State alleged, among other things, that Meta hosted ads on its platforms, but did not provide full or timely information to the three requestors in violation of the disclosure law.

After substantial discovery, including depositions of the parties' experts, Meta and the State each moved for summary judgment in July 2022. As told by the trial court, "Meta has now [asked] the Court to find the statute and regulations unconstitutional, and the State has brought a cross motion for enforcement of those elements of the law."

The superior court granted the State's and denied Meta's motion for summary judgment in October 2022. The superior court also granted the State's motion to enter judgment against Meta, awarding $24,660,000.00 in civil penalties

and $10,522,159.59 in attorney fees and costs. The court arrived at these totals by imposing the $10,000 statutory maximum for each of the 822 violations, and trebling both it and the $3.5 million in attorney fees and costs sought by the State because the court found Meta's violations were intentional. The court also granted the State's request for an injunction, which in pertinent part required Meta to satisfy the judgment in 30 days.

C.      Appellate History

Meta appeals from the orders on both the summary judgment motions and the judgment, as well as the injunction embedded in each. In November 2022, Meta filed an emergency motion for a stay of the superior court's injunction before a commissioner of this court. The commissioner granted Meta's motion for a stay of the injunction, concluding that reasonable minds could differ about the application of new relevant federal caselaw, and denied the State's motion for a bond.[3] [4]

## II.      ANALYSIS

[3] The State moved for modification of the commissioner's order on the stay, which was denied by a panel of judges, and then sought discretionary review of that decision by our Supreme Court, which was also denied. In its opening brief, the State asked this court very much in passing to lift the stay, should we rule favorably for the State. That question may be fully briefed and addressed by this court's commissioner following this decision. RAP 12.2 (the court may "take any other action as the merits of the case and the interest of justice may require").

[4] We permitted the filing of two amicus briefs in this appeal. The first was from several organizations representing technology platforms (Chamber of Progress, TechNet, and NetChoice), and the second from a consortium of organizations promoting voting rights (League of Women Voters of Washington, Fix Democracy First, the Brennan Center for Justice, and the Campaign Legal Center; together voting rights amici).

A.      Summary Judgment

As this is an appeal of the orders on summary judgment, we review whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); see Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). A "material fact" is one upon which the outcome of the litigation depends. Jacobsen v. State, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977). "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." Ranger Ins. Co., 164 Wn.2d at 552. We conduct our review de novo, performing the same inquiry as the trial court. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). We consider the facts and the inferences in the light most favorable to the nonmoving party. Id.

"Summary judgment 'is subject to a burden-shifting scheme.'" Welch v. Brand Insulations, Inc., 27 Wn. App. 2d 110, 114, 531 P.3d 265 (2023) (quoting Bucci v. Nw. Tr. Servs., Inc., 197 Wn. App. 318, 326, 387 P.3d 1139 (2016)). "The moving party meets its initial burden by submitting evidence demonstrating that it is entitled to a judgment as a matter of law." Bucci, 197 Wn. App. at 326. "The burden then shifts to the nonmoving party to set forth 'specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact.'" Id. (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)) (emphasis added).

Summary judgment gauges whether the nonmoving party has met their

"burden of production to create an issue" of material fact. Rice v. Offshore Sys., Inc., 167 Wn. App. 77, 89, 272 P.3d 865 (2012). To meet this burden, the nonmoving party "may not rely on speculation [or] argumentative assertions that unresolved factual issues remain." Bucci, 197 Wn. App. at 326 (alteration in original) (quoting Ranger Ins. Co., 164 Wn.2d at 552). Thus, for Meta to survive the State's summary judgment motion, it would have to provide "specific" evidence, and not mere "argumentative assertions," to rebut the State's claim it is entitled to a judgment as a matter of law. Id. at 326.

Meta challenges the disclosure law only as it violates its First Amendment rights and because it is preempted by Section 230. We address each in order.

B.      First Amendment

"[T]he Government may not suppress political speech on the basis of the speaker's corporate identity." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 365, 130 S. Ct. 876, 898, 175 L. Ed. 2d 753 (2010).

1.      Overview of the Disclosure Law

Given the unique nature of Washington's disclosure law, and the gravity of the various constitutional interests at stake in this case, we first endeavor to provide the necessary historical and procedural framework of the challenged laws.

a.      Origins of the Disclosure Law

More than 50 years ago, a bipartisan coalition of nonprofit organizations, political officials, and prominent media figures formed a group which drafted Initiative 276 (I-276). HUGH A. BONE & CINDY M. FEY, THE PEOPLE'S RIGHT TO KNOW: AN ANALYSIS OF THE WASHINGTON STATE PUBLIC DISCLOSURE LAW 1-2 (1978). The

7

purpose of I-276 was to promote transparency in government and political campaign practices, following new levels of social engagement as manifested by the "protest movement" in the 1960s and "growing alienation and disaffection with legislatures and other political institutions." BONE & FEY, supra, at 1-2.[5]

The promotional materials for I-276 set forth its purpose of promoting the people's "right to know" by providing the public with a greater access to information about elections, stating: "Our whole concept of democracy is based on an informed and involved citizenry. Trust and confidence in governmental institutions is at an all time low. . . . Initiative 276 brings all of this out into the open for citizens and voters to judge for themselves." State of Washington Voters Pamphlet, General Election 10 (Nov. 7, 1972). As later summarized by our Supreme Court, I-276 sought "to enlarge the information based upon which the electorate makes its decisions. The right of the electorate to know most certainly is no less fundamental than the right of privacy." Fritz v. Gorton, 83 Wn.2d 275, 298, 517 P.2d 911 (1974) (plurality opinion).

In 1972, voters approved I-276 with a 72.01% margin, carrying every county in Washington. BONE & FEY, supra, at 3. I-276 "established the PDC and formed

---

[5] Washington's initiative process, first enacted in 1911 as a constitutional amendment, allows voters to propose initiative measures directly and approve or reject them at the polls. CONST. art. II, § 1(a) (amend. 7). In effect, the initiative process designates the electorate as the "fourth element" of the government and expresses "the people['s]" "right to assert [their] will over the legislative department of the government." State ex rel. Brislawn v. Meath, 84 Wn. 302, 318, 147 P.11 (1915), abrogated in part on other grounds in Yim v. City of Seattle, 194 Wn.2d 682, 691, 451 P.3d 694 (2019); see also BONE & FEY, supra, at 1-2 ("The 1972 open government-public disclosure law continued the historic process of change and reform by direct action of the voters.").

the basis of Washington's campaign finance laws." State v. Evergreen Freedom Found., 192 Wn.2d 782, 790, 432 P.3d 805 (2019).  Among other things, "I-276 established reporting requirements for anyone supporting or opposing a 'ballot proposition.'"  Id. (quoting LAWS OF 1973, ch. 1, §§ 2(2), 10(1)); see also LAWS OF 1973 §§ 3-11 (I-276 provisions establishing sundry reporting requirements).  These provisions were consistent with one of the major purposes of I-276; namely, the "public disclosure of where campaign money comes from, who gets it and how much."  State of Washington Voters Pamphlet, General Election 10 (Nov. 7, 1972).

In 1973, Washington enacted the Fair Campaign Practices Act (FCPA), which codified I-276.  Evergreen Freedom Found., 192 Wn.2d at 790; LAWS OF 1973, ch. 1.  In adopting the purposes of I-276, the FCPA declares as the public policy of Washington:

> (1) That political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided. . . .
>
> (5) That public confidence in government at all levels is essential and must be promoted by all possible means. . . .
>
> (10) That the public's right to know of the financing of political campaigns and lobbying and the financial affairs of elected officials and candidates far outweighs any right that these matters remain secret and private.

LAWS OF 1973, Ch. 1, § 1; RCW 42.17A.001.

In enacting the disclosure law, the legislature gave a twice repeated command that its provisions shall be "liberally construed" to effectuate its policies—"to promote complete disclosure of all information respecting the financing of political campaigns and lobbying . . . so as to assure continuing public confidence in fairness of elections and governmental processes, and so as to

assure that the public interest will be fully protected." LAWS OF 1973, Ch. 1, §§ 1, 47; RCW 42.17A.001, .904.

b.      Substantive Requirements of the Disclosure Law

With the above historical and statutory context in mind, we turn to what the disclosure law currently requires in pertinent part.[6]

RCW 42.17A.345(1) requires a "commercial advertiser" who accepts or provides "political advertising or electioneering communications during an election campaign" to "maintain current books of account . . . that shall be open for public inspection during normal business hours during the campaign . . . no less than five years after the date of the applicable election."

A commercial advertiser is "any person that sells the service of communicating messages or producing material for broadcast or distribution to the general public or segments of the general public . . . used for the purpose of appealing, directly or indirectly, for votes or for financial or other support in any election campaign." RCW 42.17A.005(10).

The statute directs that "The documents and books of account" in question must include: "(a) The names and addresses of persons from whom it accepted political advertising or electioneering communications; (b) The exact nature and extent of the services rendered; and (c) The total cost and the manner of payment for the services." RCW 42.17A.345(1).

---

[6] In 2024, the legislature passed Substitute Senate Bill 5857 which aims to reorganize and "make technical amendments to certain codified statutes that involve campaign disclosure and contribution" such as the FCPA. LAWS OF 2024, ch. 164, § 101. These "changes . . . should be interpreted as technical in nature and not interpreted to have any substantive, policy implications." Id.

RCW 42.17A.345(2) also requires a commercial advertiser "to . . . provide to the [PDC] copies of the information that must be maintained and be open for public inspection pursuant to subsection (1) of this section."

The legislature further delegated authority to the PDC to implement the statute by promulgating and defining through rule making what it means to "maintain current books" and "make open for inspection." RCW 42.17A.110(1), RCW 41.17A.345(1)(b), WAC 390-18-050.

In 2018, the PDC updated its existing regulations for disclosures by "digital communications platforms," such as Meta,[7] which are a subset of "commercial advertisers." WAC 390-18-050.[8] The rule the PDC ultimately implemented requires advertisers, among other obligations discussed below, to maintain several pieces of information open for inspection or for disclosure "upon request," including by way of summary:

(a) The name of the candidate or ballot measure supported or opposed;
(b) A copy of the advertisement or communication;
(c) The name and address of the sponsoring person or persons actually paying for the advertisement or electioneering communication;
(d) The total cost of the advertising or electioneering communication; and
(e) The date(s) the commercial advertiser rendered service.

WAC 390-18-050(4), (6)(a)-(e).

---

[7] The parties agree "digital communications platforms," as defined in WAC 390-18-050(7)(g), include platforms such as Meta, Google, TikTok, and other similar entities.

[8] Wash. St. Reg. 18-24-074 (effective Dec. 31, 2018), https://lawfilesext.leg.wa.gov/law/wsr/2018/24/18-24-074.htm [https://perma.cc/2LY7-HBWA]

The PDC further specified that all commercial advertisers who accept or provide political advertising must update their books of account within 24 hours of when an ad has been distributed and, if requested, to provide the above information electronically within 24 hours. WAC 390-18-050(3).

Moreover, the rule requires that <u>digital</u> communications platforms in particular must maintain in their books and be prepared to disclose "[a] description of the demographic information, the statistical characteristics of a population (e.g., age, gender, race, location, etc.), of the audiences targeted and reached, <u>to the extent such information is collected by the commercial advertiser as part of its regular course of business</u>, and the total number of impressions generated by the advertisement or communication." WAC 390-18-050(7)(g) (emphasis added).

Meta argues that the foregoing provisions violate its First Amendment rights and begins by claiming that we must examine the disclosure law with strict scrutiny.[9]

2.      Applicable Level of Scrutiny

Regulations that burden political speech must typically withstand strict

---

[9] In prior briefing to this court's commissioner, Meta suggested it was challenging the very constitutionality of the disclosure law. Specifically, Meta suggested it was bringing an as applied challenge. We review the constitutionality of a statute de novo. <u>Evergreen Freedom Found.</u>, 192 Wn.2d at 789. And, indeed, "[i]n the First Amendment context, the asserting party may allege that a statute is either facially invalid or invalid as applied. In an as applied challenge, the statute must be considered in light of the facts of the specific case before the court." <u>Id.</u> at 796. However, Meta's appellate briefing—other than a few stray references to the disclosure law being "unconstitutional"—undertakes the facial analysis we conduct herein, and does not even mention an "as applied challenge." Having failed to engage in an as applied analysis in briefing or at oral argument before this court, that challenge is abandoned as insufficiently argued.

scrutiny, which "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United, 558 U.S. at 340. This presumption has been applied to many types of election-related regulations. See, e.g., id. at 339; Fed. Election Comm'n v. Wisc. Right To Life, Inc., 551 U.S. 449, 465-66, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007).

That said, "unlike," for example, "limits on election-related spending[10]—election-related disclosure and disclaimer requirements 'impose no ceiling on campaign-related activities.'" Gaspee, 13 F.4th at 85 (quoting Citizens United, 558 U.S. at 366) (emphasis added). In other words, "disclosure requirements are constitutional because they 'd[o] not prevent anyone from speaking.'" McConnell v. Fed. Election Comm'n, 540 U.S. 93, 201, 124 S. Ct. 619, 693, 157 L. Ed. 2d 491 (2003), overruled on other grounds by Citizens United, 558 U.S. at 310 (quoting Brief for FEC in Opposition in No. 01-582 et al. (DC), p. 112). This is so because, "disclosure and disclaimer regimes are cut from different cloth" than other burdens on political speech. Gaspee, 13 F.4th at 85. Both federal and our state courts have explored what this distinction means for purposes of the intensity of the review we apply.

Federal courts have applied exacting scrutiny to election-related disclosure requirements for decades. Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 199, 119 S. Ct. 636, 645, 142 L. Ed. 2d 599 (1999) (considering

---

[10] Election-related spending has been deemed a type of speech. See, e.g., Citizens United, 558 U.S. at 365 (discussing corporate independent expenditures on political speech).

compelled disclosure of election-related spending). Examples include disclosure requirements for televised political advertisements (Citizens United, 558 U.S. at 366-67), for referendum petitions (Human Life of Wash. Inc. v. Brumsickle, 624 F.3d 990, 1005 (9th Cir. 2010)), and for referendum petition signatures (John Doe No. 1 v. Reed, 561 U.S. 186, 192 & 199, 130 S. Ct. 2811, 2820, 177 L. Ed. 2d 493 (2010)). A plurality of the United States Supreme Court recently recounted this history and held that, "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 608, 141 S. Ct. 2373, 2383, 210 L. Ed. 2d 716 (2021) (emphasis added).[11]

Washington courts also have applied exacting scrutiny to Washington registration and disclosure requirements, including for political committees. State v. Grocery Mfrs. Ass'n, 195 Wn.2d 442, 461, 461 P.3d 334 (2020) (Grocery Mfrs. Assn. I) (regarding a trade association's registration and disclosure requirements); Evergreen Freedom Found., 192 Wn.2d at 799.

Most recently, in Evergreen Freedom Found., our Supreme Court examined separate provisions of the FCPA, which required the disclosure of financial information of entities providing pro bono legal services in furtherance of efforts to influence elections. There, the Evergreen Freedom Foundation "created sample municipal ordinances and ballot propositions for citizens to use to advance certain

---

[11] "A plurality opinion is often regarded as highly persuasive, even if not fully binding." Koenig v. Pierce County., 151 Wn. App. 221, 231, 211 P.3d 423 (2009) (citing Texas v. Brown, 460 U.S. 730, 737, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983)).

14

causes to their local city councils or commissions." Evergreen Freedom Found., 192 Wn.2d at 786. Evergreen Freedom Foundation attorneys would then litigate against jurisdictions on behalf of citizens to place these measures on the ballot. Id. at 787. Our Supreme Court held simply and directly that the "government 'may regulate corporate political speech through . . . disclosure requirements . . .'" and "exacting scrutiny applies in the campaign finance disclosure context." Id. at 798-99 (quoting Brumsickle, 624 F.3d at 994).

Here, the parties do not dispute that the law at the center of this appeal is a disclosure requirement. Nonetheless, Meta argues that we should examine the disclosure law under strict scrutiny for two reasons, neither of which is persuasive.

First, relying on Reed v. Town of Gilbert, 576 U.S. 155, 163, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015), Meta avers that the disclosure law warrants strict scrutiny because the statute "is a content-based regulation of speech since it 'applies to particular speech because of the topic discussed'—namely, Washington politics." (Emphasis added).

This argument flies in the face of each federal and state case reviewed herein, all of which dealt with "political topics" and none of which deemed such a disclosure to be "content-based" regulation. This conclusion is particularly apt here because, unlike in Reed, where the challenged statute "single[d] out specific subject matter for deferential treatment," the disclosure law attaches potential liability to any advertisement categorized as "political" without regard to an ad's specific partisan or other content. Reed, 576 U.S. at 163; RCW 42.17A.345 (covering "political advertising or electioneering communications").

15

Second, Meta argues that the rationale behind applying exacting scrutiny to disclosure laws for candidates does not apply aptly to platforms. Namely, Meta avers that disclosure laws applied to candidates are less likely to reduce the quantity and diversity of their political speech because candidates have a strong interest in complying with disclosure requirements because they have an equally strong interest in winning elections. Meta claims such logic does not hold "where a disclosure law burdens third-party platforms because they have no comparable interest offsetting burdens imposed by the law." (Emphasis added).

Meta, however, offers no authority in support of the proposition that candidates and non-candidates' disclosure obligations should be analyzed differently. On the contrary, the Supreme Court in Bonta held that "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." 594 U.S. at 608. What's more, our Supreme Court applied exacting scrutiny to the claims presented by Evergreen Freedom Foundation, which was a firm that provided pro bono legal services and was not an electoral candidate. Evergreen Freedom Found., 192 Wn.2d at 801.

Further, third-party platforms are indeed strongly motivated to comply with disclosure laws; namely, in order to continue receiving advertising revenue from candidates and political action committees and to avoid sanction. The television stations who broadcast political advertisements, discussed in Citizens United, 558 U.S. at 366-67, provide proof of such motivation, despite the disclosure requirements imposed upon them.[12]

---

[12] Meta also attempts to distinguish this matter from cases such as McConnell,

Thus, we must apply exacting scrutiny to the disclosure law.

3.    Exacting Scrutiny Analysis

"[A] campaign finance disclosure requirement is constitutional if it survives exacting scrutiny," which means that the disclosure requirement is (a) "substantially related to a sufficiently important governmental interest[,]" Brumsickle, 624 F.3d at 1005, and (b) "narrowly tailored to the interest it promotes." Bonta, 594 U.S. 611 (citing Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 2471, 5 L. Ed. 2d 231 (1960)).  In other words, as Meta agrees,[13] exacting scrutiny is a two-step analysis: first, whether there is a sufficiently important government interest that bears a substantial relationship to the statute and then whether the disclosure law is sufficiently narrowly tailored.  Gaspee, 13 F.4th at 96.

a.    Substantially Related to a Sufficiently Important
      Government Interest

We hold, as a matter of law, that RCW 42.17A.345 and WAC 390-18-050 meet the first step of the exacting scrutiny analysis: the requirements of the disclosure law are substantially related to the sufficiently important government

_____

arguing that (1) the statute in question there only required recordkeeping and not disclosure, and (2) broadcasters operate in a different constitutional framework because they are government licensees relying on limited broadcast access. However, Meta points to nothing in the McConnell opinion that suggests that the Supreme Court relied on such distinctions in its analysis.  There is no allusion in the Court's ultimate holding between a "mere records" requirement and a disclosure requirement, that its holding turned on the specific medium of the advertiser's business.

[13] Wash. Ct. of Appeals oral argument, State of Washington v. Meta Platforms, Inc., No. 84661-2-I at 4 min., 08 sec., through 4 min., 56 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024011507/?eventID=2024011507 (where Meta agrees it is a two-step analysis).

interest of informing the electorate in a timely manner about who advertisers are reaching and how advertisers are attempting to influence an election.

i.       Sufficiently Important Government Interest

The State asserts various governmental interests advanced by the required disclosures in the challenged law.  We focus only on one: the need to timely inform the electorate about who is expending money to influence an election in our state and how that money is being spent.

Both federal and state courts have long recognized the importance of fostering an educated electorate.  The United States Supreme Court in Citizens United held that laws requiring disclosure of campaign expenditures enable "the electorate to make informed decisions and give proper weight to different speakers and messages."  558 U.S. at 371.  Further, in McConnell, the Court ultimately upheld one of the requirements for timely disclosure of advertiser data considered there because, "[g]iven the relatively short timeframes in which electioneering communications are made, the interest in assuring that disclosures are made promptly and in time to provide relevant information to voters is unquestionably significant."  540 U.S. at 200.  The Court held that disclosure requirements "perform an important function in informing the public about various candidates' supporters before election day."  Id. at 201.  Even more broadly, the Court upheld another disclosure requirement because "the important state interests that prompted the Buckley Court to uphold [the Federal Election Campaign Act]'s disclosure requirements—[including] providing the electorate with information—apply in full to [the Bipartisan Campaign Reform Act]."  Id.  at 196.

18

Similarly, our state Supreme Court has held that with "I-276, the people declared that it would be the public policy of the State of Washington:

> (1) That political campaign and lobbying contributions and expenditures be <u>fully disclosed to the public</u> and that <u>secrecy is to be avoided.</u>
> . . .
> (10) That <u>the public's right to know</u> of the financing of political campaigns and lobbying and the financial affairs of elected officials and candidates <u>far outweighs</u> any right that these matters remain secret and private. . . .

<u>Evergreen Freedom Found.</u>, 192 Wn.2d at 790-791 (some emphasis added) (quoting LAWS OF 1973, ch. 1, § 1 and RCW 42.17A.001(1)).

With that intent in mind, and with respect to the kinds of disclosures at issue here, "Political Advertising and Electioneering Communications," our legislature explicitly found that "the state has a compelling interest in providing voters information about electioneering communications in political campaigns concerning candidates for state, local, or judicial office so that voters can be fully informed as to the: (i) Source of support or opposition to those candidates; and (ii) identity of persons attempting to influence the outcome of state, local, and judicial candidate elections." RCW 42.17A.300(1) (c).

In turn, Washington courts have consistently held that the State has an important interest in ensuring transparency in elections as "the public, acting as legislators on ballot propositions . . . has the right to know who is lobbying for their votes . . . [a]s such, courts have repeatedly recognized a sufficiently important government interest in as-applied challenges to campaign finance disclosure laws." <u>Grocery Mfrs. Assn.</u> I, 195 Wn.2d at 463 (citing <u>Brumsickle</u>, 624 F.3d at 1006-07).

Our Supreme Court's decision in Evergreen Freedom Found. is again instructive. There, the court held that "[t]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate." Evergreen Freedom Found., 192 Wn.2d at 800 (quoting First Nat'l Bank v. Bellotti, 435 U.S. 765, 791-92, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978)). It also expressly held that "'Washington State has a substantial interest in providing the electorate with valuable information about who is promoting ballot measures and why they are doing so.'" Id. at 800-01 (quoting State ex rel. Pub. Disclosure Comm'n v. Permanent Offense, 136 Wn. App. 277, 284, 150 P.3d 568 (2006)).

When courts have considered and upheld election-related disclosure laws under the exacting scrutiny standard, they stress—often in sweeping terms—that transparent elections not only further an important government interest but sustain democracy itself. See, e.g., Buckley v. Valeo, 424 U.S. 1, 14-15, 96 S. Ct. 612, 632, 46 L. Ed. 2d 659 (1976) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential"); Reed, 561 U.S. at 199 ("[p]ublic disclosure also promotes transparency and accountability in the electoral process to an extent other measures cannot"); Gaspee, 13 F.4th at 95 ("a well-informed electorate is as vital to the survival of a democracy as air is to the survival of human life.").

The State meets its initial burden of establishing a "sufficiently important governmental interest," and Meta does not seriously challenge that an educated

electorate is an important interest.[14]  Instead, it argues that the three other interests the State offers in support of the law are merely "speculative."[15]  We need not reach whether these other interests are "sufficiently important" governmental interests, and rely on the well-established line of cases holding that an educated populace is, not only an important government interest, but vital for democracy to function well.  Brumsickle, 624 F.3d at 1005.

Thus, we hold the State has established that an educated populace is a "sufficiently important governmental interest," which Meta has not offered any evidence to rebut.  Id.

> ii.  Substantial Relationship

We next consider whether the requirements of the disclosure law bear a "substantial relationship" to that important governmental interest.

In support of its motion for summary judgment, the State offered testimony that it was necessary for Meta to provide information such as the advertiser's address, target audience, and payment method to capture the fullest picture of an advertiser's identity and intent.  It so met its initial burden on summary judgment.

---

[14] At oral argument before this court, Meta appeared to concede that knowing who pays for political advertising is an important interest.  Wash. Ct. of Appeals oral argument, supra, at 8 min., 20 sec., through 8 min., 45 sec.  Meta instead argued that we must consider whether a law's burdens are proportionate to its benefits when examining if the law is substantially related to the government's interest, citing to Buckley, 525 U.S. at 198.  We do not interpret Buckley to hold that an educated electorate is not a sufficiently important governmental interest to meet exacting scrutiny.  Meta simply appears to be slipping into the second step of the analysis prematurely.

[15] The State offers at least three more interests advanced by the disclosure law: (1) preventing quid pro quo corruption; (2) enforcing campaign finance laws; and (3) combatting foreign interference.  As noted above, we need not address Meta's rebuttal of these additional interests.

In response, Meta argues there is no substantial relationship between the government's interest in an educated electorate and the disclosure law because some provisions of the statute require disclosure of unnecessary information, such as the payment method of the advertisement. We disagree.

Meta offers no authority that this type of analysis—where it attempts to cherry pick certain provisions—is the proper way to analyze a statutory scheme or can be used to undermine the overall substantial connection between the disclosure law and its purpose. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) ("When a party provides no citation to support an argument, this court will assume that counsel, after diligent search, has found none."). On the contrary, when interpreting regulations, we construe the act as a whole, giving effect to all of the language used. Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 8, 419 P.3d 400 (2018).

Meta next argues the disclosure law's requirements do not further the government's goal of educating the electorate because, according to Meta, only three people requested information from Meta under the disclosure law. Meta also asserts the information the disclosure law requires is already available by other means, whether its own Ad Library or disclosures required by other laws. These arguments fail for two important reasons.

First, Meta cites no authority that a certain number of voters or only individual voters must use the disclosure law to inform their own personal vote. Indeed, we are aware of no other covered entity that has made an argument on de minimis use by voters. Further, as the voting rights amici argue, it is commonly

22

known that journalists, academics, or other interested parties acquire such information for a variety of initial purposes. Some, such as journalists or academics, then disseminate such information to inform the electorate. Brumsickle, 624 F.3d at 1007 ("Access to reliable information becomes even more important as more speakers, more speech—and thus more spending—enter the marketplace."). Meta offers no evidence to the contrary.

Similarly, and second, Meta offers no authority for the proposition that a given law may not be partially duplicative of any other law, or it risks lacking a substantial relationship to the established interest. And there is no evidence in the record that all the information required by the disclosure law is available by other means. While it is true that some voters may obtain some information about who purchases advertisements via a given candidate's disclosures or even Meta's Ad Library, there is no dispute that Meta and only Meta retains all the information required by the disclosure law including, e.g., the method of payment.

By way of further context, practices such as the micro-targeting of advertisements means no one online audience member can know the full range of advertisements by a candidate or organization because the algorithm may filter ads away from or to a voter based on their personal preferences or demographics. In other words, only Meta holds the information that would answer the public's questions about who is purchasing ads on behalf of candidates and organizations, how, and for what purpose. The voting rights amici emphasize this point, asserting:

> These unique features of digital advertising pose new threats to democracy. The practice of micro-targeting means that online

audiences have little understanding of the full range of advertising run by a candidate or advocacy group, including the different messages other voters are being shown. This new ability to secretively direct a range of specially tailored, and perhaps even conflicting, messages to different audiences is incompatible with the core legitimizing aspects of democratic society—such as "publicity and transparency for the deliberative process."

(Quoting Jürgen Habermas, Political Communication in Media Society: Does Democracy Still Enjoy an Epistemic Dimension? The Impact of Normative Theory on Empirical Research, 16 COMM'NS STUD. 411, 413 (2006)).

Remarkably, as explained by State's expert, Dr. Shannon McGregor, a professor of journalism and media at the University of North Carolina, even advertising agencies and campaigns themselves do not have access to the full targeting data, meaning it would not be entirely captured in the campaign's own disclosures that are required by other laws. In full, Dr. McGregor explained:

[S]ay I want to target people with an interest in native gardening with this ad. And [Meta] sends it out . . . to some people. But if it seems to be doing really well with white women in particular areas, there are other type of native gardener interests. But it seems to be doing particularly well there.

Then the [Meta] ad auction system, the way I understand it when it's being explained to me by [Meta] employees who work on it, is that when those people who engaged or expressed interest in it will get more of it. Right? Because, like, more people like them – right – will get more of it. And that will help ensure that the ad is both seen by lots of people, but by people especially who want to engage with it. That's the benefit. Right? For the – for [Meta], in terms of engagement. And it's a benefit for the ad buyer in terms of they have engaged people, right, in their ads.

But that changes who's being targeted. Right? Because there's like the initial targeting list. And then it's like how that's shaped by the auction. And then that's when we end up with the final reach or impression numbers. And I think that middle part is not really known,

24

to my knowledge, to the consultancy or campaign placing the ad. What change that made.

Dr. McGregor summarized by explaining, "if a campaign or consultancy uploads a lookalike file for a lookalike audience to be created, based on, they have that information." However, "they will never have the information about the actual targets of that ad campaign that was based on the lookalike audience that was created by [Meta]."

The evidence in the record, including Dr. McGregor's sworn testimony, shows that the disclosure law's "requirements specify information about individual political ads that is readily available to advertising platforms, but may not be available to campaigns." Indeed, Meta itself stresses this advantage to potential advertisers because Meta collects such detailed information about its members. Clerk's Papers (CP) at 7163-65 ("Your audience is on Facebook"). Meta otherwise does not put forth evidence that there is not substantial relationship between, on the one hand, the disclosure law and, on the other hand, an informed electorate. The only evidence in the record supports the State's position on this point.

Thus, Meta has not created a genuine issue of material fact that the disclosure law does not bear a substantial relationship with the government's interest in fostering an informed electorate.

b. Sufficiently Narrowly Tailored

We hold that Meta did not create a genuine issue of material fact that RCW 42.17A.345 and WAC 390-18-050, operating together, are not sufficiently narrowly tailored to achieve their governmental aim because, inter alia, Meta does not

25

present "specific facts" showing how the disclosure law unnecessarily burdens its own or others' First Amendment rights. Bucci, 197 Wn. App. at 326.

        i.        No Genuine Issue of Material Fact as to Unnecessary Burdens on Meta's First Amendment Rights

"While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." Bonta, 594 U.S. at 608 (emphasis added). "[A] reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." Id. at 611 (emphasis added). In other words, the "[t]ouchstone for exacting scrutiny [under the First Amendment] is whether there is a 'fit [between the chosen means and the purported ends] that is not necessarily perfect, but reasonable.'" Washington Post v. McManus, 944 F.3d 506, 523 (4th Cir. 2019) (emphasis added) (quoting McCutheon v. Fed. Election Comm'n, 572 U.S. 185, 218, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014)).

In Bonta, for example, the Supreme Court concluded that a mandatory state collection of charitable donation forms was not sufficiently narrowly tailored to offset the potential privacy concerns of donors. 594 U.S. at 615-16. The Court concluded the mandatory collection requirement compromised donors' First Amendment right of free association. Id. at 616-17. Meta makes no such argument here. More relevantly, the Court was unconvinced the government needed to collect that quantity of data to combat charity fraud. Id. (characterizing the requirement as "indiscriminately sweeping up the information of every major

26

donor").

Thus far, Washington cases applying exacting scrutiny to other disclosure laws have not examined, in detail, what constitutes a "narrow tailoring" and "unnecessary burdens." Bonta, 594 U.S. at 611.

Again, "[t]he party moving for summary judgment bears the initial burden of showing that there is no disputed issue of material fact." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 216, 522 P.3d 80 (2022). "The burden then shifts to the nonmoving party to present evidence that an issue of material fact remains." Id. We will conduct this step of the analysis with reference to the superior court's granting of the State's motion for summary judgment.[16]

### (a) The State's Initial Showing

At its most general level, the State argues in briefing that the disclosure law is sufficiently narrowly tailored to achieve its purpose of informing the electorate because the "transparency" it generates "assists the public in understanding the context for why a group is advocating for or against a position in an election." In other words, "[t]he law provides the public 'with the information with which to assess the various messages vying for their attention in the marketplace of ideas.'" Br. of Resp't at 47 (quoting Brumsickle, 624 F.3d at 1008).

To explain why it is necessary to disclose information identifying all the discrete pieces of data the disclosure law requires, Dr. McGregor explained:

The value ad that Meta has is the ability to target along very specific

---

[16] At oral argument, Meta acknowledged that the result would be the same if we were to conduct our analysis with reference to the court denying Meta's summary judgment. Wash. Ct. of Appeals oral argument, supra, at 3 min., 23 sec., through 3 min., 59 sec.

lines that is different than other types of advertising. In different mediums.

And when asked what the "basis" for making that assertion was, Dr. McGregor responded:

Because that is the reason that people advertise on Meta and other digital platforms. Is because it is lower cost and more precise.

According to the State, "[t]argeting is the primary service of a product rendered by Meta for sponsors of political ads and is essential to understanding the purpose and meaning of political ads appearing on that platform." And each piece of data required by the disclosure law supports the requestor's understanding of the nature of the targeting involved in a given ad.

Thus, we hold that the State has put forth competent evidence that there is, not just a reasonable "fit" with the government's goals, but that the goal is perfectly aligned with the data required by RCW 42.17A.345 and WAC 390-18-050. McManus, 944 F.3d at 521. That is, the disclosure law is tailored to pull into the light of day the most essential and unique aspects of modern social media political advertising: micro-targeting.

Moreover, the State argues that determining whether the content of an ad is "political" is not an unnecessary burden, or as challenging as Meta claims, because "Meta already knows how to and does identify political ads based on a definition."[17] Specifically, the State avers Meta is not burdened unnecessarily by the disclosure law, but is simply refusing to filter the ads that it already tracks

---

[17] The State argues that Meta's "broader definition" of political ads already captures Washington political ads, which means Meta can maintain records for a broader set than technically required.

28

nationally and internationally.  See Wash. Ct. of Appeals oral argument, supra, at 17 min., 2 sec., through 17 min., 26 sec.

In support, the State proffers documents related to the online "Meta Business Help Center," which previously defined "[a]ds about social issues, elections or politics" as:

(1) Made by, on behalf of, or about a candidate for public office, a political figure, a political party, a political action committee, or advocates for the outcome of an election to public office; or

(2) About any election, referendum, or ballot initiative, including "go out and vote" or election campaigns; or

(3) About social issues in any place where the ad is being placed; or

(4) Regulated as political advertising.

Finally, as another State expert, Dr. Laura Edelson, a postdoctoral researcher an New York University whose expertise is in Facebook political advertising, testified, Meta's alternate path to providing the same data (training a new sorting model, which will be discussed further below) was "[d]efinitely one of the more expensive options."  Dr. Edelson recommended, instead, that Meta "set up Washington state as its own region within the Ad Library," which again is already collecting ad data and would cost approximately $200,000.  In arriving at this estimate, Dr. Edelson reasoned that "to make the change itself would probably – you need one engineer – I'm going to be really, really conservative and say a quarter.  And obviously, you need to – you know, a few other people like a tester; you need a product manager to sort of oversee things."  Regardless of the precise cost, Dr. Edelson opined that this option would be a "very inexpensive route to comply with the Washington State [disclosure law]."

29

Dr. Edelson's recommendation was based in part on her own experience "buil[ding] a topic model for elections that covered state and local elections," but not specifically for Washington, and on the undisputed fact that Meta has already altered its Ad Library to accommodate the election laws of other nations, for example, the United Kingdom and Canada. Dr. Edelson explained that "[Meta] made additional data about the advertiser, including the address, available through the ad library, and I believe to be in compliance with -- with U.K. law" around the time of the 2019 election.

Dr. Edelson testified in detail as to Meta's assertion of an unnecessary burden and concluded that Meta "can comply with these regulations" as it is "[s]omething that is well within—very comfortably within Meta's capabilities; it wouldn't strain it as a business." We hold the State has met its initial burden to show a "fit" that is neither ill tailored to the government's goal or otherwise unnecessarily burdensome on Meta's rights.

### (b)     Meta's Response

As an initial response, Meta argues the State's assertion that it could easily comply, such as by modifying the existing Ad Library, were "premised on guesswork and erroneous assumptions." Such a "conclusory" statement does not defeat the foregoing evidence offered by the State at this stage of the summary judgment burden shifting. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 527, 404 P.3d 464 (2017).

More generally, Meta argues that the "marginal benefit" of the disclosure

law is "easily outweighed by the severe burdens [it] places on platforms." Specifically, Meta makes three major categories of arguments.

First, Meta asserts it is indeed burdensome to determine which ads are political. As told by Meta, the disclosure law makes identifying ads challenging because the term "political advertising" broadly includes any ad "used for the purpose of appealing, directly or indirectly, for votes or financial or other support or opposition to any election campaign." Meta avers the challenge is compounded by the term "electioneering communication," which it asserts covers any ad that "clearly identifies a candidate" even if it does not include the candidate's name. According to Meta, determining whether an ad meets the above definition "often requires not just [1] initial screening by an algorithm, but also [2] subsequent human review."

As to the human review argument, Meta cited to the testimony of its employee, Frank Antzoulis, a program manager, describing how Meta's "markets team" conducted "sweeps" to "identify any ads that our normal models couldn't catch." In an attempt to comply with the disclosure, Mr. Antzoulis testified that "those sweeps were performed at a biweekly cadence," although the sweeps later were reduced from biweekly to monthly.

Mr. Antzoulis explained that, as part of their research, the teams identify which candidates are running in Washington, then check if they appear in ads by undertaking the following process:

> We have a couple of different steps for them within our protocol where they essentially run a query to try to identify any ads that our normal models couldn't catch. They also do a little bit of research on who the current politicians are that are running in the Washington

31

State, and they take a look at their pages to see if there's any ads that may be running that our machines didn't catch, things like that.

Q: And you said that these sweeps are done by people?

A: Yes.  They're done by employees of Meta.

Q: And do the employees have the discretion to craft queries?

A: They do, if they have that capability.  It's not a necessity for them to be able to craft a query, but if -- we have queries that we created for them that they can use to take a look at, but they're investigators. They have the ability to track things down, and they know how to use our internal tooling.

Q: What is your internal tooling? . . .

A: We have various tools that the business integrity team uses to understand what kind of ads people have running, what kind of advertiser they are, what violations they've experienced in the past, the ability to run queries . . . .

 (Emphasis added).

In short, an unknown number of persons on a team do a "little bit of research" and may or may not craft queries or use other tools, on a bi-weekly to monthly basis, to catch ads the algorithm may not catch.

As to the argument regarding the algorithm, Meta offered the testimony of an expert witness, Dr. Steven Weber, professor at the School of Information at the University of California Berkeley, who opined that a "machine learning system cannot serve as the exclusive solution to classify whether an advertisement falls under the Washington Disclosure Law" because:

Algorithms are primarily written by people, and a significant amount of coding work and system development is required to write and refine algorithms that are efficient and accurate.  In addition to the algorithm, machine learning systems in settings of this kind depend upon "training data."  A set of training data typically consists of manually labeled examples of the classification that the system is

being asked to perform.

(Emphasis added). Dr. Weber elaborated that:

> the classification required by the Washington Disclosure Law is a difficult one, even for humans to implement. It is not clear how a human would create such labeled data with a consistently high degree of accuracy, given that whether an ad is "political" is a <u>complex</u> determination that often requires input from multiple individuals. Moreover, even attempting to create this set would take <u>a large amount of time</u> (for example, to have multiple humans review and debate the instances that are challenging to classify) with no guarantee of it being successful or stable.

> Creating a sufficiently robust set of training data would be challenging for an additional reason. The need to identify Washington elections, candidates, and ballot propositions in particular means that very specific examples would have to be used in the training data in order to teach the machine to distinguish Washington Political Ads from other types of political advertising. But a candidate or ballot proposition in the State of Washington may only have a handful of ads, making it unlikely for there to be a sufficiently large corpus of training data.

(Emphasis added and omitted.) Further, Dr. Weber contrasted "ads about 'social issues, elections, or politics,' was a broader category than that of "ads about Washington state and local elections." Thus, it would be "much <u>easier</u> to create a high-quality training data set for these ads" because "there are far more examples available of ads that relate to 'social issues, elections, or politics.'" (Emphasis added).

In short, Meta's position is that it would take an unspecified but "significant amount of coding work and system development," followed by an equally unspecified "large amount of" human debate time to address this "complex" definitional challenge.

Finally, Meta offered testimony from Ani Vanesyan, a manager of business

33

integrity for Meta, that it had designed its ad identification system on a country-by-country basis. And, Meta argues that adding a Washington state-specific component to that system would include a "substantial and significant amount of work" that would "challenge the stability of the tool." (Emphasis added).

Even so, Ms. Vanesyan in the same deposition admitted modifying the Ad Library would still be "technically feasible."

> The way that the tool is written on the back end in terms of code is done in a particular way. Currently, it's done at the country level with all the fields. To create a whole new flow, while it could be technically feasible given some amount of time and certain number of engineers, et cetera, it would include substantial and significant amount of work to make this.
>
> It could also challenge the stability of the tool, because the more complex the code becomes on the back end, the more unstable the tool is. It would also entail quite a few new flows being created to differentiate ads, Washington State versus the rest of the advertising. So this would be nontrivial, and the time spent on this will also potentially be time away from more scalable solutions from extending political authenticity and transparency globally, et cetera.
>
> Q: So it would be costly; is that fair?
>
> A: Not just costly in the sense of, you know, time and resources. I think this would be complex. Again, it would challenge the stability of the tool, which doesn't really deal with cost but could potentially jeopardize our commitments of authenticity and transparency if the tool was, let's say, frequently not working as well as potentially delay our plans to provide these solutions to more countries.

(Emphasis added).

In sum, as to the burden imposed, Meta asserts that the disclosure law contains several that are unnecessary because revisions to the algorithm would take a "significant amount of work" and the human review would be "complex" and "costly" in "time and resources," even as it acknowledges that the former is

"technically feasible" and Meta's market teams have undertaken a version of the latter process with a "little bit of research" and some queries.

Although Meta has put forth evidence that complying with the law would be unappealing in some sense, it has failed to establish a genuine issue of material fact because it has not provided evidence that supports an "understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." Bonta, 594 U.S. at 611.

Specifically, Meta's argument fails to quantify how "significant" the revisions to the algorithm would be, how much more "time and resources" it would take for human review, or even how much any change in its practices would cost. After years of discovery, we know nothing more about the burden on Meta than high level, even "speculative," generalities which lack the "specificity" to create a genuine issue of material fact. Bucci, 197 Wn. App. at 326. Although Meta provided evidence about two steps it would need to take, and alludes that it would need to hire multiple employees to, among other things, identify ads for retention and disclosure, nowhere does it identify the specific cost or number of employees required to do so.

Moreover, none of Meta's cited evidence indicates that it cannot comply; rather, the evidence only shows, as the State phrases it, that it would be inconsistent with Meta's corporate priorities to do so. Meta does not contest, or offer competing evidence to counter, this point. As the superior court found, "[i]n essence, the only reason why Meta refuses to comply with the law is, to put it colloquially, they don't want to let the public see how the sausage is made."

Finally, the question is whether the burdens, however steep, are unnecessary and require narrow tailoring. Bonta, 594 U.S. at 611. Meta's argument on these issues addresses none of the provisions of the disclosure law in question, let alone shows how any particular provision may create an unnecessary or untailored burden and thus the argument misses the mark at a more fundamental level.

For Meta to survive summary judgment, it must "set[] forth specific facts which sufficiently rebut the moving party's contentions" and not mere "argumentative assertions." Ranger Ins. Co., 164 Wn.2d at 552 (quoting Meyer v. Univ. of Wash., 105 Wn.2d 847, 852, 719 P.2d 98 (1986)). This first argument fails in that regard.

This conclusion leads us to Meta's second argument, which contends at a more granular level that the disclosure requirements of RCW 42.17A.345 and WAC 390-18-050 are unnecessarily burdensome because they require communications platforms (a) to "disclose massive amounts of information"[18] (b) to anyone without a known purpose,[19] (c) on an "expedited timeframe,"[20] (d) all

---

[18] Meta avers the disclosure law requires far more information than necessary, including, among other things, the address and payment method of the advertiser, neither of which furthers the State's interests.

[19] Meta contends it is too burdensome to permit anyone to request ads for any reason, instead of just Washington voters, and "[p]ermitting requests from people other than Washington voters bears no relation" to the State's interest in informing its voters. Meta otherwise does not indicate what purpose would render a request legitimate.

[20] Meta argues it is unreasonably burdensome for it to respond to requests within two business days. Even if it stipulated that it already collects the ad information, Meta avers that sorting what to disclose is time-consuming, and two days is insufficient and unnecessarily quick.

year long,[21] which (e) must be maintained for unnecessary amount of time[22] and (f) where few people have actually requested this data.[23]  For Meta, the disclosure law creates a burden that, in the form of "death by a thousand cuts," is not sufficiently narrowly tailored to serve the State's interests.

In response to Meta's assertion that requiring the disclosure of information such as the advertiser's payment method is unnecessary, the State expands on its argument that such information is necessary to help voters understand who pays for advertising to persuade them.  Dr. McGregor explained, "if we are talking about digital political ads, to understand it . . . someone would need to know the source; the cost; the content of the ad; and the targeting parameters."  This information is necessary, Dr. McGregor says, "[b]ecause giving only one part of that and not the other part at the same time could lead to, you know, a deep misinterpretation of what the nature of advertising that was actually happening on the platform was."

For example, as explained by another State witness, Dr. Travis N. Ridout,

---

[21] Meta posits that the disclosure law's requirement that it respond to information requests throughout the entire year is unnecessary.  In support, Meta avers that, because other Washington advertising disclosure laws require ad sponsors to disclose advertising information for only 21 days before an election instead of year-round, this disclosure law should do the same.  Meta does not cite authority that suggests these other statutes control its compliance with the disclosure law, but simply argues that the State bore the burden to prove the year-round disclosures were necessary.

[22] Meta argues the disclosure law is not sufficiently narrowly tailored because it requires it to retain the ad data for five years.  Meta does not explain how the five-year retention requirement is burdensome, it merely compares the WAC 390-18-050 with a statute from another state.

[23] Meta contends that, while anyone can request this data for any purpose, noting that not many people have actually requested the ad data in the first place.

the Director of the School of Politics, Philosophy, and Public Affairs at Washington State University, a candidate may attempt to either encourage its supporters to participate or discourage their opposition from participating. It is not enough to know that "I use a political ad that makes people angry. If I'm aiming that at supporters of my campaign—or presumed supporters of my campaign, that can be used to mobilize." Alternatively, Dr. Ridout explained, "if I use that same ad that makes people angry, but aimed that at people who are not my supporters, that can actually serve to—to demobilize." As such:

> when there is misinformation contained within political ads, I think having that targeting information can help to diagnose that and see whom that information is aimed at. [24]

We agree with the State that gathering and providing the advertiser's identity, intended audience, and the source of their funding, for example, is closely tailored to the State's goal of helping a voter to evaluate why they received a certain ad. It is true that a particular piece of the data required by the disclosure law in a given situation may not always align perfectly with the State's goals; perhaps the payment method may not be that illuminative to understand a given ad. However, the "[t]ouchstone for exacting scrutiny [under the First Amendment] is whether there is a 'fit [between the chosen means and the purported ends] that is not necessarily perfect, but reasonable.'" McManus, 944 F.3d at 523 (emphasis

---

[24] In another example unrebutted by Meta, the State noted at oral argument before this court that the disclosure law revealed some advertisers in the 2016 election had bought political ads through Meta purchased the ads with rubles. Wash. Court of Appeals oral argument, supra, at 21 min., 51 sec. through 22 min., 18 sec. Thus, the payment information may inform a voter how to appropriately weigh the ad's persuasive value.

added) (quoting McCutcheon, 572 U.S. at 218).  Exacting scrutiny simply does not require a law use the least restrictive means.  Bonta, 594 U.S. at 608.  And there is no genuine issue of material fact that the fit is reasonable.

As to Meta's claim that non-Washington residents may request this data for any reason, the State again avers that oftentimes journalists, academics, activists, and others who may not reside in Washington are in the best position to disseminate information about ad data.  In many cases,  as the State asserts in its brief, "[t]he public relies on third parties to become informed," including academic researchers, in this case, testifying on behalf of the State.  Meta does not dispute this claim.  Thus, we agree with the State that Meta does not establish a genuine issue of material fact that the "fit" between who can request information, why they may do so, and the State's goal is unnecessarily burdensome.  McCutcheon, 572 U.S. at 218.

Meta next contends that it is overly burdensome to have to comply with information requests within two business days,[25] but the Supreme Court in McConnell considered a requirement for timely disclosure of advertiser data and concluded that, "[g]iven the relatively short timeframes in which electioneering

---

[25] For its part, the State asserts that the disclosure law actually only requires Meta to maintain such records within two business days.  And the State argues that that timeframe is not burdensome because Meta already has the information in its Ad Library within 24 hours.  That is acknowledged.  See Clerk's Papers (CP) at 7305 (in Meta's answer to an interrogatory, it stated "[g]enerally, an ad will appear in the Ad Library within 24 hours from the time it gets its first impression.  Any changes or updates made to an ad are typically reflected in the Ad Library within 24 hours.").  Moreover, a 48-hour email transmission is only one way of making the record open for "public inspection;" other options include having the record available in person during normal business hours.  WAC 390-18-050(4).  But that answer does not go to the core question as to whether the requirement is an unnecessary burden.

communications are made, the interest in assuring that disclosures are made promptly and in time to provide relevant information to voters is unquestionably significant." 540 U.S. at 200. We agree with the State that Meta has failed to establish a genuine issue of material fact that a 48-hour requirement sufficiently narrowly tailored, even if not a perfect fit in all cases, given the well-known dynamic nature of campaigns.

In response to Meta's contention that requiring it to respond to disclosure requests year-round is overly burdensome, the State argues that, in fact, advertisers purchase ads for political purposes outside of the 21-day period before an election, which is a standard laid out in other disclosure laws. And, as noted, the State has shown that Meta already collects this information in its usual course of business throughout the year. Even if there may be time periods where fewer political ads are posted, we agree with the State that Meta has not established a genuine issue of material fact that a year-round requirement is insufficiently fitted to the government's purposes or otherwise unnecessarily burdensome. McCutcheon, 572 U.S. at 218.

Meta also avers that a five-year retention period is overly long, but fails to offer a reason, let alone evidence, to show why retaining ad data for five years is burdensome. Moreover, the sworn testimony of Ms. Vanesyan establishes that Meta's Ad Library retains this targeting information as part of its regular business for "at least" seven years:

Q: So the targeting information that is selected by the advertiser, that is not in the Ad Library correct?

A: Yes, that's correct.

Q: And is that – that's not in the Ad Library report; correct?

A: My understanding at this time and recollection is that it's also not in the Ad Library report.

Q: But that information is retained by [Meta] for seven years; is that correct?

A: At least seven years, yes.

Meta, thus, does not establish a genuine issue of material fact as to whether the retention period required under the disclosure law is unnecessarily burdensome.

Finally, as to Meta's claim that few people have actually requested this data, there is no authority requiring that there be a minimum number of requestors before any given person or the PDC itself avail itself of the disclosure law. See RCW 42.17A.345(2) (requiring platforms to provide the PDC copies of the ads on demand). And, it offers no authority to suggest that the court must consider the number of requestors or how such a determination factors into a ruling on summary judgment, given the constraints of the procedural posture presented in this case.

We conclude that Meta does not prevail on even its more granular arguments either because it has failed to demonstrate any genuine issue of material fact that certain specific provisions of the disclosure law are not narrowly tailored or are unnecessarily burdensome, or because controlling authority does not support these various positions.

As to its third category of arguments, Meta asserts that it is burdened because it faces severe penalties if it fails to comply with the disclosure law.[26] In

---

[26] Part of its contention here turns on whether Meta would be sanctioned for

arguing the fees are burdensome, Meta compares the Washington disclosure law with a statute from another state, which does not control here. Meta further argues that even an inadvertent error on its part can open it to expensive sanctions in perpetuity. Meta offers no binding authority for the proposition that the enforcement mechanism of an otherwise constitutional statute creates is unnecessarily burdensome. And Meta does not create a genuine issue of material fact by simply speculating about future possibility of further enforcement action. Bucci, 197 Wn. App. at 326.[27]

We conclude that Meta has not met its burden "to present evidence that an issue of material fact remains" as to whether the disclosure law is insufficiently narrowly tailored to its stated purpose. Haley, 25 Wn. App. 2d at 216. In turn, the trial court did not err in concluding the disclosure law withstood the second step of the exacting scrutiny analysis, at least with respect to Meta's own claimed burdens.

ii.        Standing to Raise Burden on the Rights of Others

Meta next argues that the disclosure law unconstitutionally burdens not only its own First Amendment rights, but also those or other rights of at least two other classes of persons; namely, the privacy interests of the purchaser and viewers of ads, and the free speech rights of upstart, grassroots candidates.

---

violations per undisclosed ad versus per failure to respond to requests. We will address the calculation of damages and penalties per violation in Part C.

[27] Furthermore, when Meta was asked at oral argument before this court what the best evidence was that the disclosure law burdened Meta, its counsel referred to its own self-imposed ban and decision to leave political advertising in Washington, rather than comply with the law. Wash. Court of Appeals oral argument, supra, at 30 min., 48 sec., through 32 min., 15 sec. Meta's seemingly circular reasoning does not create a genuine issue of material fact and thus is also unavailing.

As a preliminary matter, explored at oral argument,[28] we have serious doubts that Meta has standing to assert even the constitutional portions of its claims. Although the parties did not brief this issue, an appellate court may raise the issue of standing sua sponte at any time, even if a party has not raised it. RAP 2.5(a); In re Recall of West, 156 Wn.2d 244, 248, 126 P.3d 798 (2006).

It is axiomatic that "[e]very action shall be prosecuted in the name of the real party in interest." CR 17(a). And the issue of standing is reviewed de novo by appellate courts. Knight v. City of Yelm, 173 Wn.2d 325, 336, 267 P.3d 973 (2011). The question is whether, under the established rules of third party standing: (1) the litigant has suffered an injury-in-fact; (2) the litigant has a close relationship to the third party; and (3) there exists some hindrance to the third party's ability to protect their own interests. Mearns v. Scharbach, 103 Wn. App. 498, 512, 12 P.3d 1048 (2000); see also Powers v. Ohio, 499 U.S. 400, 410-11, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) ("recogniz[ing] the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied") (emphasis added).

Focusing only on the third element of prudential third party standing, Meta fails to establish that, nor can we envision how, there is some "hindrance to the third party's ability to protect their own interests." Meta does not present any evidence or offer any authority indicating that ad purchasers, viewers, or political campaigns cannot litigate their own First Amendment claims. Indeed, political

---

[28] See Wash. Court of Appeals oral argument, supra, at 23 min., 19 sec., through 23 min., 51 sec.

campaigns and actors in Washington have vigorously pursued their own right to free speech in our state and, in fact, have specifically alleged that the FCPA infringed upon their First Amendment rights with respect to political ads. See, e.g., Wash. State Republican Party v. Public Disclosure Comm'n, 141 Wn.2d 245, 4 P.3d 808 (2000); Rickert v. Public Disclosure Comm'n, 161 Wn.2d 843, 168 P.3d 826 (2007). Thus, while there is no authority on point, we hold, on this record and on the briefing before us, that Meta lacks standing to asserts such claims.

As to the non-constitutional third-party privacy rights allegedly violated here, it is clear that Meta has no third party standing to raise its constitutional claims based on the right to privacy of another. See, e.g., State v. Farmer, 116 Wn.2d 414, 805 P.2d 200 (1991) (denying standing where a defendant convicted of sexual exploitation of a minor and patronizing a juvenile sex worker challenged the governing criminal statute for violating the victim's First Amendment); Keepers, Inc. v. City of Milford, 807 F.3d 24 (2d Cir. 2015) (same).

Accordingly, we decline to consider Meta's arguments regarding the rights, constitutional or otherwise, of third parties.

4.     McManus Does Not Control

The authority Meta most relies on is McManus, which it claims "explains why the [] Disclosure Law is unconstitutional." We conclude that McManus is distinguishable.

In McManus, the Fourth Circuit struck down, stated generally, "a Maryland law [that required] newspapers, among other platforms, to publish on their websites, as well as retain for state inspection, certain information about the

44

political ads they decide to carry." 944 F.3d at 510 (emphasis added).[29] Specifically, in some similarity to the disclosure here, the Maryland law there required the covered entities, "within 48 hours of an ad being purchased . . . [to] display somewhere on their site the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad." Id. at 511. Further, the Maryland law required platforms to "keep [the ad] information online for at least a year following the relevant election" for voters to review upon request. Id.

Several news outlets sued to enjoin the Maryland law from becoming effective because its "publication and inspection requirements violated the First Amendment—both facially, as a regulation that targets neutral third-party platforms, and also as-applied, as a law encompassing news outlets." Id. at 512.

The court concluded that the Maryland act's disclosure and publication requirements were "compelled speech." Id. at 514. The court held that a core problem with Maryland's law was that it made "certain political speech more expensive to host than other speech because compliance costs attach to the former and not to the latter." Id. at 516.

Meta argues in its opening brief that "McManus's logic applies with 'even greater force' here because the Disclosure Law places heavier burdens on platforms and thus is more likely to result in closing off avenues for political speech." In reply, Meta asserts that the holding in McManus does not turn on the

---

[29] The Maryland legislature revised its disclosure laws to more clearly include online political advertising to, among other reasons, address the rise in foreign election interference targeting its residents. McManus, 944 F.3d at 510-11.

fact that the Maryland statute imposed disclosure requirements upon newspapers. This argument is unpersuasive.

The Court in McManus decided the case at least in part because "the [Maryland] Act forces news outlets to publish certain information on their websites and, if they fail to do so, empowers the state to seek a court order to have content pulled from these platforms. This brings with it yet another First Amendment infirmity." McManus, 944 F.3d at 517-18 (emphasis added).

Meta differs significantly from a newspaper. For purposes of the service in question, Meta is comparable to a billboard where advertisers pay, not only to display their messages, but for Meta to decide where to place the billboard, and thus target a particular group of viewers. There is nothing in the record that demonstrates that Meta exercises editorial control over the content, as a newspaper does. Unlike billboards, "[t]he [Supreme] Court has made clear that news products are of a part with parades, political leaflets, fundraising pitches, or similar expressive endeavors." Id. at 520 (emphasis added).

Moreover, the court in McManus repeatedly emphasized that "the core problem with this provision of the Act is that it lacks any readily discernable limits on the ability of government to supervise the operations of the newsroom." Id. at 518-19 (emphasis added). "Not only does [the Maryland act] compel the Publishers to turn over information to state regulators, it also brings the state into an unhealthy entanglement with news outlets," by requiring that they alter the content of a news product. Id. at 518-19. The court held, "[t]he Supreme Court has made clear that when the government tries to interfere with the content of a

newspaper or the message of a news outlet, the constitutional difficulties mount." Id. at 517. No such editorial entanglement occurs here with Meta.

Finally, in McManus, one of the requirements of the Maryland law was that newspapers display information to the public at large in their product, id. at 514, while the Washington laws only require Meta to disclose the required data to individual requesters in a variety of formats. RCW 42.17A.345; WAC 390-18-050(4)(a)-(b). The speech at issue here, to the extent there is any, is simply transmittal of data Meta already keeps in a form separate and apart from its product platform, and, thus, is not "compelled" in the same way.

In sum, we conclude McManus is distinguishable because it arises from a materially different type of legal framework within a different state statutory scheme as applied to a different type of entity. McManus was not presented with some of the differentiating facts that appear in the case before us, where the requirement (a) is one of only record-keeping and disclosure or inspection of data Meta is already keeping, (b) does not apply to newspapers and their unique and complex constitutional rights, and (c) does not involve the government in editorial decisions, as there are none.

Thus, Meta has not carried its burden, as the nonmoving party on summary judgment, "to create an issue" of material fact. Rice, 167 Wn. App. at 89. Ultimately, Meta's response is simply an "argumentative assertion[] that unresolved factual issues remain." Bucci, 197 Wn. App. at 326 (quoting Ranger Ins. Co., 164 Wn.2d at 552).

B.      Express Federal Preemption

Meta next avers that the disclosure law is expressly preempted by federal law. Under the Supremacy Clause of the United States Constitution, "the laws of the United States ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. As such, state laws that conflict with federal law are "without effect." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981).

A given federal law may avail itself of this well-known principle and preempt a state law expressly or implicitly. Kissan Berry Farm v. Whatcom Farmers Coop., 23 Wn. App. 2d 490, 500, 516 P.3d 821 (2022). Namely, "[i]f 'Congress expressly withdraws specified powers from a state through a statutory provision,' there is express preemption." City of Woodinville v. Eastside Cmty. Rail, LLC, 22 Wn. App. 2d 121, 127, 510 P.3d 355 (2022) (quoting Beatty v. Fish & Wildlife Comm'n, 185 Wn. App. 426, 454, 341 P.3d 291 (2015)).

Courts gauge a federal law's preemptive effect by "'focus[ing] on the plain wording of [a given federal statute's preemption] clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" Commonwealth of Puerto Rico v. Franklin Cal. Tax-free Tr., 579 U.S. 115, 125, 136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016) (quoting Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 594, 131 S. Ct. 1968, 179 L. Ed. 2d 1031 (2011)).

"'We must interpret an express preemption clause narrowly but fairly.'" Woodinville, 22 Wn. App. 2d at 127 (quoting Kitsap County v. Kitsap Rifle & Revolver Club, 1 Wn. App. 2d 393, 404, 405 P.3d 1026 (2017)). That is, express

preemption is found "when Congress has 'unmistakably . . . ordained,' that its enactments alone are to regulate a part of commerce, [and thus] state laws regulating that aspect of commerce must fall."  Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963)).

Consistent with this authority, our Supreme Court has held that there is a strong presumption against preemption.  Nw. Wholesale, Inc. v. Pac Organic Fruit, LLC, 184 Wn.2d 176, 184, 357 P.3d 650 (2015) ("'any consideration of preemption issues starts with the assumption that the historic police powers of the States are not to be superseded by ... Federal Act unless that is the clear and manifest purpose of Congress.'") (quoting Hue v. Farmboy Spray Co., Inc., 127 Wn.2d 67, 78, 896 P.2d 682 (1995)) (internal quotation marks and alterations omitted).

"The meaning of the presumption against preemption is twofold."  Hue, 127 Wn.2d at 79.  "First, where Congress expressly addresses state authority in a federal law, the preemptive scope of the federal law should not be extended any further by resort to an implied preemption analysis."  Id.  Second, "'Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not preempted.'"  Id. (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992)).

"Preemption is a question of law we review de novo."  McKee v. AT&T Corp., 164 Wn.2d 372, 387, 191 P.3d 845 (2008).

1.    Section 230 of the Communications Decency Act

Section 230 of the federal Communications Decency Act states, in pertinent part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And, in its preemption clause, the statute declares that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Id. at (e)(3).

"Section 230 was prompted by a state court case holding Prodigy [an online platform] responsible for a libelous message posted on one of its financial message boards." Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008) (discussing Stratton Oakmont, Inc. v. Prodigy Servs. Co., No. 31063/94, 1995 WL 323710, 1995 N.Y. Misc. LEXIS 229 (Sup. Ct. May 24, 1995) (unpublished)). The Roommates.com court observed that, in Stratton Oakmont, "Prodigy had become a 'publisher' under state law because it voluntarily deleted some messages from its message boards 'on the basis of offensiveness and bad taste' and therefore was legally responsible for the content of defamatory messages that it failed to delete." Id. (emphasis added) (internal quotation marks omitted) (citing Stratton Oakmont, 1995 WL 323710 at *4). In that situation, "[u]nder the reasoning of Stratton Oakmont, online service providers that voluntarily filter some messages become liable for all messages transmitted, whereas providers that bury their heads in the sand and ignore problematic posts altogether escape liability." Id. "In passing section 230, Congress sought to spare interactive computer services this grim choice." Id.

More broadly, Section 230 preemption seeks "two parallel goals[:] . . . 'to

promote the free exchange of information and ideas over the internet and to encourage voluntary monitoring for offensive or obscene material'" by shielding platforms from liability. Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1099-1100 (9th Cir. 2009) (quoting Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1122 (9th Cir. 2003)).

Section 230 preemption intuitively applies to actions sounding in tort, such as defamation, but courts have made clear that its scope may apply to all civil cases as "many causes of action might be premised on the publication or speaking of what one might call 'information content.'" Id. at 1101 (quoting 47 U.S.C. § 230(c)(1)). "Thus, what matters is not the name of the cause of action . . . what matters is whether a cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Id. at 1101-02 (quoting 47 U.S.C. § 230(c)(1)).

The Ninth Circuit created a three-part Section 230 preemption test in Barnes. Id. Under this test, Section 230 "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." Id. (emphasis added).

In the present appeal, the parties only contest the second prong of Barnes, as there is no dispute that Meta is an "interactive computer service" and that third parties generate the "information content" of the political ads.

By way of a brief taxonomy, courts have held that a plaintiff treats a defendant as a publisher, and thus preemption applies, in two relevant scenarios

consistent with the Barnes test. First, preemption may occur when "'a service provider [is held] liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'" Schneider v. Amazon.com, Inc., 108 Wn. App. 454, 463, 31 P.3d 37 (2001) (emphasis added) (quoting Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997)).

Second, a state law is preempted when it "would necessarily require an internet company to monitor third-party content." HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676, 682 (9th Cir. 2019) (emphasis added). HomeAway concerned a municipal ordinance prohibiting short-term rental platforms, such as Airbnb and HomeAway, from processing rental transactions for properties not listed in an official city registry of such properties. Id. at 680. HomeAway argued Section 230 preempted the ordinance because "it implicitly require[d] them 'to monitor the content of a third-party listing and compare it against the City's short-term rental registry before allowing any booking to proceed." Id. at 682.

The court in HomeAway upheld the city ordinance, reasoning that the "booking transaction-content that, while resulting from the third-party listings, is distinct, internal, and nonpublic." Id. "While keeping track of the city's registry is 'monitoring' third-party content in the most basic sense, such conduct cannot be fairly classified as 'publication' of third-party content" as the platforms "have no editorial control over the registry whatsoever." Id. at 683 (some emphasis added).

The court also held that Section 230 does not "suggest that [its] immunity attaches any time a legal duty might lead a company to respond with monitoring

or other publication activities." Id. at 682 (emphasis added). "[I]t is not enough that the third party [content is] a 'but-for' cause of such internal monitoring." After all, "[t]o provide broad immunity 'every time a website uses data initially obtained from third parties would eviscerate [the disclosure law].'" Id. (quoting Barnes, 570 F.3d at 1100).

Moreover, a "'service provider remains liable for its own speech' and for its own unlawful conduct." Airbnb, Inc. v. City of Boston, 386 F. Supp. 3d 113, 119 (D. Mass. 2019) (emphasis added) (quoting Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007)). In contrast, liability does not attach for "publication," which "involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." Barnes, 570 F.3d at 1102 (emphasis added). As such, if a "provision is aimed at regulating [the defendant's] own conduct, and not punishing it for content provided by a third party, [Section 230] does not preempt it." Airbnb, Inc., 386 F. Supp. 3d at 120 (emphasis added).

In short, a law is preempted under Section 230 if it "(1) makes the defendant liable for publishing certain information to third parties, and (2) seeks to impose liability based on that information's improper content." Henderson v. Source for Public Data, L.P., 53 F. 4th 110, 120-21 (4th Cir. 2022) (emphasis added).

2.    Application of Section 230 to Meta

Meta urges us to hold that Section 230 expressly preempts Washington's disclosure law. Specifically, Meta argues the disclosure law is "preempted twice over because a defendant's being a publisher and engaging in publication are both

elements of a claim under the law." As to the former, Meta avers that the disclosure law defines "commercial advertisers" effectively as publishers in that they must "sell[] the service of communicating messages or producing material for <u>broadcast or distribution</u> to the general public or segments of the general public." (Emphasis added). As to the latter, Meta claims liability under the disclosure law is triggered, and preempted, only when an ad is "publicly distributed or broadcast;" when a publisher is engaging in the act of publishing.

Meta fundamentally mischaracterizes the two main aims of RCW 42.17A.345 and WAC 390-18-050, namely, recordkeeping and disclosure. The disclosure law, indeed, does regulate online platforms that have "accepted or provided political advertising or electioneering communications during the election campaign" and distributed such content. RCW 42.17A.345(1). But the fact of distribution alone does not end the inquiry. "[I]t is not enough that the third party [ads] are a '<u>but-for</u>' cause of" the basis of liability. <u>HomeAway</u>, 918 F.3d at 682 (where the court was considering the meaning of "internal monitoring") (emphasis added). Instead, the State must be treating Meta as a publisher by either penalizing its exercise of a publisher's traditional editorial functions, or forcing Meta to monitor third party content.

Here, as explained in more detail above, entities covered by the disclosure law are obligated to "maintain current books of account and related materials as provided by rule." RCW 42.17A.345(1). The disclosure law then tasks platforms with preserving numerous pieces of data underlying these political ads for public inspection during normal business hours or disclosure. <u>Id.</u> at (1)(a)-(c); WAC 390-

18-050(6)-(7). In sum, these record keeping obligations are independent of Meta's "broadcasting" services, even if we were to assume "broadcasting" is tantamount to "publication."

The disclosure law does not create liability for the actual publication of ads or, crucially, the actual content of an advertisement. Instead, the disclosure law imposes liability squarely for Meta's own conduct, namely whether it "maintain[ed] current books of account" that can be "open for public inspection." RCW 42.17A.345(1). And if a "provision is aimed at regulating [the defendant's] own conduct, and not punishing it for content provided by a third party, [Section 230] does not preempt it." Airbnb, 386 F. Supp. 3d at 120.

Meta next argues the disclosure law improperly treats Meta as a publisher by "requir[ing] the platform to review third-party content posted on its site." Specifically, Meta avers that the disclosure law's "nuanced definition of 'political advertising'" necessarily requires Meta to monitor third-party content in violation of HomeAway.

Even if we were to assume the disclosure law requires Meta to review ads, any more than it already does voluntarily, it "does not proscribe, mandate, or even discuss the content of the" ads beyond identifying the broad, high-level categories of "political advertising or electioneering communications during the election campaign." HomeAway, 918 F.3d at 683 (emphasis added); RCW 42.17A.345(1). As the Fourth Circuit held, Section 230 "applies only when the claim depends on the content's impropriety." Henderson, 53 F.4th at 125 (emphasis added). The disclosure law is not concerned with the impropriety of any actual specific content

55

of any political ad. In that sense, the disclosure law is content-neutral and non-partisan. And for that reason, this argument fails.

At most, the disclosure law merely tasks Meta with placing ads into "political" and "non-political" categories to facilitate future inspection or disclosure, which it has attempted to do for several years anyway through its Ad Library. The disclosure law does not require Meta to "publish, withdraw, postpone or alter content" contained within those groupings. Schneider, 108 Wn. App. at 463 (quoting Zeran, 129 F.3d at 330) (emphasis added). In other words, while categorization may be monitoring "in the most basic sense, such conduct cannot be fairly classified as 'publication' of third-party content" as Meta has "no editorial control over" the ads "whatsoever." HomeAway, 918 F.3d at 682-83. As such, Meta "face[s] no liability for the content" of political ads. Id. at 684 (emphasis added). In turn, the second prong of the three-part test in Barnes is not met.

The prior analysis resolves the question as a matter of law. However, as a practical matter, it is noteworthy that the disclosure law defines the terms "political advertising or electioneering communications" in a way that simplifies even such minimal monitoring. The definitions target advertisements which "appeal directly or indirectly for . . . support or opposition in any election campaign" or "[c]learly identifies a candidate for a state, local, or judicial office." RCW 42.17A.005(21)(i), (40) (emphasis added). In other words, instead of covering every conceivable political issue or debate on its platform, the disclosure law narrows its focus to ads related to two readily identifiable entities: campaigns and candidates.

Such ads are readily identifiable because the Washington Secretary of

State provides a public and searchable online database of filed candidates, initiatives, and referenda for both past and upcoming elections.[30] This database largely covers the disclosure law's definition of "candidates." RCW 42.17A.005(8)(a)-(d).[31] Thus, covered platforms may crosscheck political ads it identifies with these easily searchable lists of elected positions, candidates, and ballot initiatives, which is a process similar to the registry at issue in HomeAway. 918 F.3d at 683-84.

In HomeAway, platforms merely had to ensure they were not "completing any booking transaction for properties not licensed and listed on the City's registry." Id. at 680. Similarly, Meta can compare the ads against Washington's publicly available list of elections and candidates, and then preserve and prepare the information related to such ads for inspection and possible disclosure. In neither case does such "monitoring" constitute "publication" under Section 230.

For these reasons, we hold that Section 230 does not preempt the RCW 42.17A.345 and WAC 390-18-050. The disclosure law does not treat Meta as a publisher of political ads, impose liability for the content of individual ads, or truly

---

[30] VoteWA, WASH. SEC'Y OF ST., https://voter.votewa.gov/CandidateList.aspx (last visited Apr. 30, 2024); Initiatives and Referenda Filed in 2024, WASH. SEC'Y OF ST., https://apps.sos.wa.gov/elections/initiatives/referenda.aspx (last visited Apr. 30, 2024); Past Initiatives & Referenda, WASH. SEC'Y OF ST., https://apps.sos.wa.gov/elections/initiatives/statistics.aspx (last visited Apr. 30, 2024).

[31] The disclosure law defines "candidate" to include more than those that have officially "file[d]" for office." RCW 42.17A.005(8)(b). The definition also includes one who "[r]eceives contributions or makes expenditures or reserves space or facilities with intent to promote the individual's candidacy . . . announces publicly [their campaign] . . . [p]urchases commercial advertising space . . . to promote [their] candidacy" or "[g]ives consent to another person" to do any of the above actions on their behalf. Id. at (8)(a)-(d).

require Meta to monitor ads. Instead, it imposes liability for Meta's own conduct; failure to identify, preserve, and disclose political ads and some of its underlying data. At a minimum, Meta has not overcome the "presumption against preemption." Hue, 127 Wn.2d at 79.

Thus, Meta's two substantive challenges to the disclosure law have failed and the court did not err in finding the State was "entitled to a judgment as a matter of law." CR 56(c).

Next, we turn to whether the superior court properly assessed the penalties and fees it did.

C.     Penalties

The penalty provision of the disclosure law provides that a "person who violates any of the provisions of this chapter may be subject to a civil penalty of not more than ten thousand dollars for each violation." RCW 42.17A.750(c). The penalty provision then lists 14 factors to guide the court's decision, including a catch all, permitting a court to consider "[o]ther factors relevant to the particular case." Id. at (d)(i)-(xiv). A superior court may then treble damages if "the violation is found to have been intentional." RCW 42.17A.780.

Meta challenges the superior court's $24,660,000.00 civil penalty for 822 violations of the disclosure law. Meta substantively presents three arguments. First, it argues the number of violations should have been calculated on a per-request basis instead of a per-ad basis. Second, it argues the court improperly imposed the statutory maximum penalty of $10,000 for each violation. Third, it argues the court improperly trebled damages after finding Meta's violations were

intentional.  These arguments are unpersuasive.

    1.    Per-Ad or Per-Request

    The disclosure law permits a court to impose a penalty "for each violation." RCW 42.17A.750(c).  However, it does not affirmatively define the term "violation" or provide a specific method for calculating the number of violations in a particular case.  Rather, the disclosure law negatively defines the term, in the sense that it excludes "a violation of this chapter that is not a remediable violation, minor violation, or an error classified by the [PDC] as appropriate to address by a technical correction."  RCW 42.17A.005(54).  Such exclusions include ads costing less than the minimum amount defined in RCW 42.17A.405(2), violations that did not materially harm the public interest, or situations where entities took sufficient corrective action.  RCW 42.17A.005(46).  Neither party asserts Meta committed an excluded violation.

    At the summary judgment hearing, the superior court initially stated Meta's violations would be based on the number of requests.  The judge explained that:

> enforcement penalties and so on – have to be limited to the requests
> . . . when somebody makes a request and they don't produce it, then
> they're not complying with the law.  But before . . . I don't think that's
> something I can enforce against them with – absent somebody
> making a request.

However, the court's subsequent written order based Meta's violations on the number of undisclosed advertisements.  The court did not elaborate as to why it changed its method of calculation, but the effect was to increase the number of violations from 12 to 822.  As such, the total penalty increased from $120,000 to $8,220,000.00 which the superior court then trebled to $24,660,000.00.

Both parties rely on <u>Bittner v. United States</u>, 598 U.S. 85, 143 S. Ct. 713, 215 L. Ed. 2d 1 (2023), in support of their respective positions.  The U.S. Supreme Court in <u>Bittner</u> examined the federal Bank Secrecy Act, which requires disclosure of certain financial information to "assist the government in everything from criminal and tax to intelligence and counterintelligence investigations."  598 U.S. at 98.  The Court ultimately calculated the number of violations per-report rather than for each account listed within said reports.  <u>Id.</u> at 103-04.

<u>Bittner</u> provides a helpful analytical framework for examining two competing penalty calculation methods in that it systemically examined (a) the text and legislative history of the statute, (b) the "contextual clues," such as government documents, which reveal the "the consistency of an agency's views," and (c) the rule of lenity.  <u>Bittner</u>, 598 U.S. at 101.  We address each in turn.

a.    <u>Text and Legislative History</u>

"When interpreting a statute, the court's fundamental objective is to ascertain and give effect to the legislature's intent. We begin with the plain meaning of the statute. . . .  If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent." <u>Leander v. Dep't. of Ret. Sys.</u>, 186 Wn.2d 393, 405, 377 P.3d 199 (2016) (citations omitted); <u>Belleau Woods II, LLC v. City of Bellingham</u>, 150 Wn. App. 228, 240, 208 P.3d 5 (2009) (in gauging a statute's plain meaning, "it is appropriate to look at the language in the context of the statutory scheme as a whole.").   We review questions of statutory interpretation de novo.  <u>Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.</u>, 182 Wn.2d 398, 406, 341 P.3d 953 (2015).

Meta makes two textual-based arguments. Meta first argues that a plain language interpretation of the disclosure law supports a per-request standard, pointing to its requirement that the data "shall be open for public inspection," which means "the relevant 'violation' is a failure to respond to a request for 'public inspection.'" Relatedly, and echoing the superior court's initial ruling, Meta avers that it is not logical to fix the measure of violations as anything but requests because "[w]ithout a request for public inspection, there can be no violation." In other words, Meta claims both the language and logic of the disclosure law mandate that the proper metric of the violation is the number of requests. We disagree with this cramped view of the disclosure law for four reasons.

Meta's argument is belied first by the FCPA and disclosure law's overall plain intent to ensure full disclosure of certain records, namely, "contributions and expenditures" of advertisements on its social media platforms. Specifically, the disclosure law states in its introductory provision that "political campaign and lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided." RCW 42.17A.001(1) (emphasis added). Again, the first obligation the disclosure law imposes on commercial advertisers to meet this goal is to maintain records, "books of account and related material," that shall remain "open" for public inspection, without any requirement that anyone actually requests to inspect such records. RCW 42.17A.345(1). Further, the second obligation the disclosure law imposes on commercial advertisers is to be prepared to provide the PDC copies of those records described in (1) of the statute and the requests of those records, even if the PDC never actually demands such records or requests.

RCW 42.17A.345(2).

The plain language of the disclosure law evidences its intent to preserve and sunlight relevant data of each individual ad on Meta's social media platforms, without any requirement that any particular voter or the government step into the sunlight to inspect the records. In this way, Meta's discrete serial obligation, to preserve and prepare for inspection or "full disclosure" every individual "contribution[] and expenditure[]," is distinct from any individual request for such disclosure and is the proper metric for violations of this tool of transparency. RCW 42.17A.001(1).

Further, we may not ignore the legislature's twice repeated command that the disclosure law "be liberally construed . . . so as to assure continuing public confidence of fairness of elections and governmental processes, and so as to assure that the public interest will be fully protected." RCW 42.17A.001(11) (emphasis added); RCW 42.17A.904 ("The provisions of this act are to be liberally construed to effectuate the policies and purposes of this act.") (emphasis added). Where the purpose of the disclosure law is to avoid secrecy and ensure confidence in our elections, liberal construction of its penalty provision is to assess penalties for violations of the failure to preserve or permit inspection of individual political advertisements, without additionally requiring someone or some agency to request such records.

Indeed, our courts, in a variety of different but related settings, have reiterated the Washington's campaign finance laws' intent to ensure full disclosure of individual records. See, e.g., State v. Econ. Dev. Bd. for Tacoma-Pierce County,

9 Wn. App. 2d 1, 11, 441 P.3d 1269 (2019) (quoting Evergreen Freedom Found., 192 Wn.2d at 790) ("The FCPA is designed, in part, 'to provide the public with full disclosure of information about who funds initiative campaigns and who seeks to influence the initiative process.'") (quoting LAWS OF 1973, ch. 1); see also State v. Eyman, 24 Wn. App. 2d 795, 815, 521 P.3d 265 (2022) (quoting State v. Grocery Mfrs. Ass'n, 198 Wn.2d 888, 892, 502 P.3d 806 (2022) (Grocery Mfrs. Assn. II)) ("'The FCPA is an attempt to make elections and politics as fair and transparent as possible.'"). These statements of intent do not rely on the voter prompting or availing themselves of such transparency.

Returning to Bittner, there, the Bank Secrecy Act "[did] not speak of accounts or their number. The word 'account' does not even appear. Instead, the relevant legal duty is the duty to file reports." 598 U.S. at 93. That is, the Bank Secrecy Act's "statutory obligation is binary. Either one files a report 'in the way and to the extent the Secretary prescribes,' or one does not." Id.

In contrast, while the penalty provision in the disclosure law does not explicitly reference "political advertising" and "electioneering communications[,]" related provisions of the disclosure law and its accompanying regulations expressly reference both units of measurement multiple times. See RCW 42.17A.750 (damages provision); RCW 42.17A.345(1); WAC 390-18-050(2)-(3), (5)-(7). Perhaps most notably, unlike the challenged law in Bittner, the disclosures required here "must include the political advertisement or electioneering communication itself." WAC 390-18-050(7). In other words, the disclosure law specifically requires a social media platform to provide individualized copies of

63

each advertisement to the receiving party.

Finally, even if we were to hold that the legislature intended that a violation should be calculated on a per-request basis, a requestor would need only file a separate request for each individual advertisement, which would easily circumvent Meta's proposed legislative intent. We do not interpret statutes to permit such absurd results. Jespersen v. Clark County, 199 Wn. App. 568, 578, 399 P.3d 1209 (2017) (courts must "construe a statute to avoid absurd results.").

The plain language of RCW 42.17A.345 and WAC 390-18-050, and the statutory scheme as a whole, supports the superior court's imposition of a per-ad metric for the calculation of damages.

> b.     "Contextual Clue"

Meta next argues that one "contextual clue" provides support for its claim that the proper measure of damages is to calculate damages per unfulfilled request. Specifically, Meta cites to a document which summarized the PDC's initial findings as follows: "[Meta] failed to respond to two requests for information, violating RCW 42.17A.345 on two occasions." (Emphasis added). Meta argues this document betrays an inconsistency in the agency's views. This singular piece of evidence is hardly convincing.

Even assuming arguendo that this document represents the official position of the PDC, "the government's guidance documents do not control our analysis and cannot displace our independent obligation to interpret the law," which we conducted de novo above. Bittner, 598 U.S. at 97; Utter, 182 Wn.2d at 406.

Moreover, this statement does not undermine the consistency of the PDC

or the State's views. As explained by the State, and not disputed by Meta,[32] this document arose from a "proposed stipulation and recommendation that was rejected by the PDC, the latter of which was prepared by an assistant attorney general charged with representing PDC staff (not the State, nor the [Attorney General's Office], nor even the PDC and its Commissioners)." This non-public, and ultimately rejected, PDC document is a far cry from the record before the court in Bittner, where a variety of "warnings, fact sheets, and instructions" established that "the government seemed to tell the public that the failure to file a report represents a single violation." 598 U.S. at 97 (citing a "number" of such government documents). There is no such record here reflecting any kind of pattern of inconsistency.

Meta's asserted single contextual clue does not weigh in its favor under Bittner's three-part framework

  c. Rule of Lenity

Meta argues that, at a minimum, the disclosure law is ambiguous, requiring an application of the rule of lenity.

Under the rule of lenity, "[i]f after applying rules of statutory construction we conclude that a statute is ambiguous, 'the rule of lenity requires us to interpret the statute in favor of the defendant absent legislative intent to the contrary.'" State v. Baker, 194 Wn. App. 678, 684, 378 P.3d 243 (2016) (emphasis added) (quoting City of Seattle v. Winebrenner, 167 Wn.2d 451, 462, 219 P.3d 686 (2009)). The

---

[32] In reply, Meta's simply acknowledges that this document represented "how PDC staff initially read the Law" during their internal deliberations. (Emphasis added).

rule of lenity only applies if a civil penal statute is "reasonably susceptible of at least two meanings." Kahler v. Kernes, 42 Wn. App. 303, 308, 711 P.2d 1043 (1985). However, "[i]t is important to bear in mind that the rule of lenity does not apply anytime a statute is determined to be ambiguous." Winebrenner, 167 Wn.2d at 469 (Madsen, J., concurring). That is, "[t]he rule of lenity applie[s] only when the Legislature's intent is lacking." Pers. Restraint of Bowman, 109 Wn. App. 869, 875-76, 38 P.3d 1017 (2001).

Here, the disclosure law is clearly a civil penal statute as it authorizes "sanctions" and "penalties" for violations. RCW 42.17A.750. However, for the reasons stated in Part C.1.a., the legislature's intent in passing the disclosure law, to ensure full disclosure of certain records independent of a later request, is clear. That is, the legislative intent is not "lacking" nor, in turn, is the disclosure law reasonably susceptible to two meanings. Thus, we need not appeal to the rule of lenity.

Therefore, under the Bittner framework, the proper method of calculation is, as a matter of statutory interpretation, by advertisement. [33]

### 2. Statutory Maximum Penalties

Under the disclosure law, the statutory maximum penalty is ten thousand

---

[33] Each party contrasts or compares the disclosure law with the Washington's Public Records Act ("PRA"). Meta analogizes to Yousoufian v. King County Executive, 152 Wn.2d 421, 98 P.3d 463 (2004), to support a per-request metric. In response, at oral argument, the State cited to Wade's Eastside Gun Shop, Inc. v. Dep't of Labor & Indus., 185 Wn.2d 270, 372 P.3d 97 (2016), to argue that the PRA, and by extension the disclosure law, grants superior courts broad discretion in fashioning penalties. Wash. Ct. of Appeals oral argument, supra at 26 min., 14 sec. through 26 min., 51 sec. As these arguments are not fully developed, we will not consider the comparison further.

dollars per violation. RCW 42.17A.750(c). "When assessing a civil penalty, the court <u>may</u> consider the nature of the violation and <u>any relevant circumstances</u>." <u>Id.</u> at (d) (emphasis added). The statute contains numerous factors to guide the superior court, including a catch-all for all "[o]ther factors relevant to the particular case." <u>Id.</u> at (d)(i)-(xiv). The legislature did not, however, mandate <u>how</u> a court should weigh the factor or that any one factor is greater than any other.

"We review the trial court's assessment of civil penalties within the statutory limits for an abuse of discretion." <u>State v. Mandatory Poster Agency, Inc.</u>, 199 Wn. App. 506, 525, 398 P.3d 1271 (2017). A court abuses its discretion if "its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons." <u>Gildon v. Simon Prop. Grp., Inc.</u>, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). "An abuse of discretion is found if the trial court relies on <u>unsupported facts</u>, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law." <u>Id.</u>

On appeal, Meta faults the superior court for "not credit[ing] a single one of those factors" enumerated in RCW 42.17A.750(d). Further, in its briefing, Meta claims the following eight facts "warranted a penalty at the bottom of the statutory range. . .":

> First, Meta has promoted political transparency in Washington, sometimes exceeding Washington's requirements. . . .
>
> Second, Meta undisputedly disclosed much of the required information immediately on request. . . .
>
> Third, there is no dispute that for some of the requests at issue, Meta produced two and sometimes three additional categories of required information. . . .

Fourth, Meta established a formal process to efficiently respond to requests under the [disclosure law]. . . .

Fifth, it is undisputed that none of the requests at issue in this case were made for the core purposes that animate [the disclosure law]—informing voters and ensuring election integrity. . . .

Sixth, during the PDC's investigation of Mr. Sanders's and Mr. Trask's 2019 complaints, it is undisputed that Meta extensively consulted and cooperated with PDC Staff. . . .

Seventh, Meta never intentionally or knowingly skewed Washington's political process by favoring one candidate or cause over another. . . .

Eighth, penalties in similar cases are significantly lower than the Superior Court's penalty.[34]

(Emphasis omitted.)

In its response brief, the State asserts that the following facts justified the court's decision.

First, Meta has a history of noncompliance. In 2018, the State filed its first lawsuit for Meta's failure to have complied with the law since at least 2013, which resulted in a stipulated judgment. . . .

Second, Meta is the largest social media company in the world, and a significant part of its business model is to sell advertising across its platforms in the United States and in more than 160 countries around the world. . . .

Third, Meta is extensively involved in campaign finance activity by providing and facilitating the targeting of political ads intended to influence elections in Washington. . . .

Fourth, Meta did not act in good faith and refused to take responsibility for its violations.  Despite stipulating to a judgment in

---

[34] The final mitigating factor appears to be referencing two settlements between the State and Google where the latter paid $200,000 and $400,000 respectively for violations of the disclosure law.  However, our Supreme Court recently upheld a $18 million disclosure law penalty for a different type of violation for "intentionally concealing the source of political contributions." Grocery Mfrs. Assn. II, 198 Wn.2d at 892.

> 2018, Meta repeatedly continued to violate the [disclosure law]. . . .
>
> Finally, the superior court correctly recognized Meta's brazen behavior.  Meta continues now to arrogantly justify its pattern of intentional violations by arguing—without any factual support—that its own business model and decisions made compliance "impossible."

(Emphasis omitted.)

The court explained its reasoning for imposing the $10,000 statutory maximum penalty at length.  First, it found Meta "didn't really make a significant effort to try and comply, either in terms of providing any targeting information, which is clearly required by the law, or in terms of making a serious attempt to comply in a timely fashion."  Second, the court found it "would be very easy for [Meta] to simply organize the information in a way that would make it readily available" as "[it] had to take it all in digitally in the first place in order to get the ad."  Additionally, the court considered "Meta's compliance history" which included a "pattern of knowing and repeated violations" as well as "Meta's extensive experience with campaign finance law."  Finally, the court noted "Meta's lack of good faith and failure to acknowledge and take reasonability for its violations."

Again, the language of the disclosure law's penalty provision is highly discretionary.  RCW 42.17A.750.  Specifically, it states the court "may" consider numerous factors, but also allows courts to consider all "[o]ther factors relevant to the particular case."  Id. at (d)(i)-(xiv).  Stated otherwise, these factors are meant to guide, not restrict, the court.  We hold that the five facts adduced by the State and the superior court's express findings are consistent with the factors the legislature meant to guide the exercise of the court's discretion.

Notably, Meta does not argue that the record was entirely devoid of such evidence, instead it claims that the "Superior Court did not credit a single one of [Meta's] factors." Meta offers no authority that a trial court must credit any particular factor under the disclosure law or announce on the record how it was weighing its decision vis-à-vis the factors. We decline the invitation to create such a requirement here. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Ultimately, we review a superior court's decision to impose a penalty within the statutory limits for an abuse of discretion. Mandatory Poster, 199 Wn. App. at 525. In similar circumstances, we "accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences." Kreidler v. Cascade Nat'l. Ins. Co., 179 Wn. App. 851, 861, 321 P.3d 281 (2014). While another judge may have considered the factors and evidence differently, Meta failed to establish the superior court abused its discretion as it did not show its factual findings were unsupported by the record. Gildon, Inc., 158 Wn.2d at 494.

Thus, we affirm the superior court's decision to assess the $10,000 statutory maximum penalty for each violation.[35]

---

[35] Meta also asserts that the disclosure law violates its Fifth Amendment due process rights to the extent it measures damages as per-ad and if a court may impose the statutory maximum penalty of $10,000 in circumstances such as these. Indeed, under the Fifth Amendment, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television

3.    Treble Damages

The disclosure law provides that if "the violation is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, <u>may</u> be trebled as punitive damages." RCW 42.17A.780 (emphasis added). "We review the trial court's assessment of civil penalties within the statutory limits for an abuse of discretion." <u>Mandatory Poster</u>, 199 Wn. App. at 525.  A court's decision is based on untenable grounds if the factual findings are unsupported by the record. <u>Gildon</u>, 158 Wn.2d at 494.

Our Supreme Court has held that "[w]hether treble damages should be imposed is thus clearly a discretionary decision for the trial court, which can be made only after the court determines that a violation was intentional." <u>Grocery Mfrs. Assn.</u> I, 195 Wn.2d at 473.  The meaning of "intentional" is not defined in the disclosure law, meaning we must apply its "usual and ordinary meaning" unless context dictates otherwise or the ordinary meaning would lead to absurd results. <u>Id.</u> at 471.  Our Supreme Court, in examining the FCPA, has held that "[t]he ordinary meaning of intentional, in both civil and criminal contexts, requires intent to accomplish an unlawful act, but not subjective knowledge that the act is unlawful." <u>Id.</u>

Meta argues the superior court improperly imposed treble damages and

---

<u>Studios, Inc.</u>, 567 U.S. 239, 253, 132 S. Ct. 2307, 183 L. Ed. 2d 234 (2012).  Here, however, Meta's half-page Fifth Amendment argument is undeveloped and conclusory.  "[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion." <u>Seven Gables Corp. v. MGM/UA Entertainment Co.</u>, 106 Wn.2d 1, 14, 721 P.2d 1 (1986) (quoting <u>United States v. Phillips</u>, 433 F.2d 1364, 1366 (8th Cir. 1970)).  As such, we need not and will not consider this argument further.

improperly determined its violations were "intentional" under RCW 42.17A.780. Meta essentially repeats previous arguments, claiming that the various mitigating factors of RCW 42.17A.750(d) present here, the "contextual clue" document, and its 2018 self-imposed ban on displaying political ads prove its lack of subjective intent to violate the law.

The superior court did not abuse its discretion by trebling damages. At a minimum, the court's decision is tenably based on at least the following two intentional acts, each of which flatly contravened unambiguous provisions of the disclosure law.

First, Meta admitted it unilaterally issued a "Request for Information from Facebook, Inc. Regarding Washington Political Advertising" form to requestors, which stated that a request "cannot exceed one year and must begin January 1, 2019 or later." These limitations plainly violate the disclosure law, which has no such temporal restrictions and, instead, requires that platforms retain the pertinent records "for a period of no less than five years after the date of the applicable election." RCW 42.17A.345. The court would not have abused its discretion by basing its decision on a finding that such a unilateral curtailment of the disclosure law's plain provisions showed an "intent to accomplish an unlawful act." Grocery Mfrs. Assn. I, 195 Wn.2d at 471.

Second, and equally substantively, the superior court found that Meta "intentionally redacted required information from the records it provided in response to requests." This finding is adequately supported by the record. A Meta employee testified to his personal knowledge that that Meta did not "provide any

targeting lower than the state level." An email sent by Meta's counsel to one of the requestors confirmed that testimony, when it stated that "any granular geographic targeting (e.g., city or zip code) has been redacted and that we have provided that information on a state-level instead." Further, in response to the State's requests for admission, Meta admitted to "redact[ing] more specific location targeting information from some business records." As such, Meta's response to requests for targeting data, even where that data was available quite easily, was purposefully incomplete. These redactions were in direct contravention of the disclosure law, which clearly requires commercial advertisers to provide data on the "audiences targeted and reached" by ads, and which do not permit an advertiser to provide only statewide data. WAC 390-18-050(7)(g)(ii).[36]

The superior court did not abuse its discretion in finding that Meta's violations were intentional and in awarding treble damages on that basis, as those decisions are supported in the record. Gildon, 158 Wn.2d at 494.[37]

Accordingly, we hold that the superior court did not err in imposing the penalty in the manner and substance it chose.

D.      Attorney Fees

---

[36] The legislature amended WAC 390-18-050, effective June 2024. Because these amendments do not affect the legal arguments of this case, we cite the current version.

[37] Meta also argues the penalty imposed was an unconstitutionally excessive fine, in violation of the Eighth Amendment. Meta's half-page argument generally alleges the penalty is "grossly disproportionate[,]" under factors laid out in United States v. Bajakajian, 524 U.S. 321, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998), but without any specific discussion of said factors or application to the facts of this case. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). Thus, we will consider this argument no further.

"If applicable law grants to a party the right to recover reasonable attorney fees or expenses on review . . . the party must request the fees or expenses as provided in this rule, unless a statute specifies that the request is to be directed to the trial court." RAP 18.1(a). Specifically, "[t]he party must devote a section of its opening brief to the request for fees or expenses." RAP 18.1(b).

The disclosure law provides that "[i]n any action brought under this chapter, the court may award to the commission all reasonable costs of investigation and trial, including reasonable attorneys' fees to be fixed by the court." RCW 42.17A.780. Further, "[i]f the violation is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, may be trebled as punitive damages." Id. Alternatively, "[i]f the defendant prevails, [they] shall be awarded all costs of trial and may be awarded reasonable attorneys' fees to be fixed by the court and paid by the state of Washington." Id. We review whether there is a basis for awarding attorney fees de novo. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

In the trial court, the State requested, and was granted, its costs and reasonable attorneys' fees pursuant to RCW 42.17A.780, based on the findings reviewed herein. On appeal, the State appropriately briefed its request for fees on appeal compliant with RAP 18.1(b). Neither in its opening brief nor in its reply does Meta contest the superior court's award or this additional fee request on appeal.

Thus, we grant the State's request for its fees and costs on appeal. The State may perfect its request before the commissioners of this court consistent with our rules of appellate procedure.

### III.  CONCLUSION

We affirm.

Díaz, J.

WE CONCUR: